1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

NORTHERN DIVISION


AVKO EDUCATIONAL RESEARCH
FOUNDATION, a Michigan
Corporation, and DONALD J.
McCABE, Author,

        Plaintiffs,

v.                            File No. 11-13381

THOMAS A. MORROW, an individual,
WAVE 3 LEARNING, INC., HOME
SCHOOL HOLDINGS, INC., and
HOME SCHOOL, INC.,

        Defendants.
_____/


MOTION FOR TEMPORARY RESTRAINING ORDER



BEFORE THE HONORABLE THOMAS L. LUDINGTON

United States District Judge

United States Post Office Building

1000 Washington Avenue

Bay City, Michigan  48708

Monday, January 23, 2012

2

APPEARANCES:


For the Plaintiffs:          SUSAN PAYNE WOODROW (P29844)
                             3631 Dorothy Lane
                             Waterford, Michigan  48329
                             Phone: (248) 760-1818
                             suzywoodrow@hotmail.com



For the Defendants:          JOHN DI GIACOMO (P73056)
                             TRAVERSE LEGAL, PLC
                             810 Cottageview Drive
                             Unit G-20
                             Traverse City, MI  49684
                             (231) 932-0411
                             john@traverselegal.com


To Obtain a Certified Transcript:

PEG L. GOODRICH, CSR-0258, RMR
Federal Official Court Reporter
www.transcriptorders.com

3

# T A B L E   O F   C O N T E N T S

PAGE

MOTION FOR TEMPORARY RESTRAINING ORDER:                4

OPENING COMMENTS

    By Ms. Woodrow                                     4
    By Mr. Di Giacomo                                 25

GENERAL QUESTIONS

    By the Court                                      58

RULING BY THE COURT                                  128

CERTIFICATE OF COURT REPORTER:                       134

EXHIBITS:                               IDENTIFIED

    None.

4

| | |
|---|---|
| 1 | Bay City, Michigan |
| 2 | Monday, January 23, 2012 |
| 3 | 9:13 a.m. |
| 4 | (Court, counsel and parties present) |
| 5 | THE LAW CLERK:  Calling the case of AVKO |

6  Educational Research Foundation, et al, versus Morrow,
7  et al, Case No. 11-13381.

8          MS. WOODROW:  Susan Payne Woodrow on behalf of
9  AVKO and Don McCabe.  I'm prepared to proceed this
10 morning.

11         THE COURT:  Good morning.

12         MR. DI GIACOMO:  John Di Giacomo on behalf of
13 Wave 3 Learning and Thomas Morrow, your Honor.

14         THE COURT:  Good morning.

15         MR. DI GIACOMO:  Good morning.

16         THE COURT:  Miss Woodrow --

17         MS. WOODROW:  Yes, your Honor.

18         THE COURT:  -- could you introduce me to the
19 folks that are at counsel table with you, please.

20         MS. WOODROW:  I would be delighted to.  This
21 is Mr. Donald McCabe and he is the author of the works
22 over there (indicating) and this is Robert McCabe and
23 he is the director of AVKO Educational Foundation,
24 Incorporated.

25         THE COURT:  All right.  And there is also a

5

1  gentleman by the name of Brian.  Brian McCabe?

2          MS. WOODROW:  Brian McCabe is not here.  He is

3  Robert McCabe's son and is not participating today.

4          THE COURT:  Okay.

5          MS. WOODROW:  I did not feel his testimony would

6  be necessary in this evidentiary hearing.

7          THE COURT:  And Mr. McCabe's first name is

8  Donald, correct?

9          MS. WOODROW:  Donald, yes.  It is Donald J.

10          THE COURT:  Okay.

11          MS. WOODROW:  Yes, your Honor.  I have two other

12  witnesses that will be -- other witnesses that will be

13  testifying.  Do you need their names at this time?

14          THE COURT:  I do not.

15          MS. WOODROW:  Thank you.

16          THE COURT:  We will talk about them here in a

17  few minutes.  Could you introduce me --

18          MR. DI GIACOMO:  Yes, your Honor.  This is

19  Thomas Morrow.  He is the president of Wave 3 Learning

20  and also the named defendant as well.

21          THE COURT:  Thank you.

22          MR. DI GIACOMO:  Thank you.

23          THE COURT:  I have about three hours.  What

24  would you like to accomplish this morning?

25          MS. WOODROW:  I believe we have an evidentiary

6

1   hearing --

2           THE COURT:  We do.

3           MS. WOODROW:  -- for the preliminary injunction

4   and I have several witnesses.  I felt when we talked

5   about it before, we -- at the status conference, that we

6   would have probably nine hours worth of testimony and so

7   I could begin with my first witness and we can move

8   forward from there, your Honor.

9           THE COURT:  Well, we can split -- split up the

10  hearing.  I mean, I have to balance your case --

11          MS. WOODROW:  I know.

12          THE COURT:  -- timewise with about 500 others.

13          MS. WOODROW:  Yes, I understand.

14          THE COURT:  And I've got a multi-defendant case

15  that needs attention at one.

16          Now, I've spent about an hour kind of walking my

17  way through some of the information in the materials.  If

18  you don't mind, what I would like to do in a somewhat

19  informal opening statement, so I can get an understanding

20  for where the parties agree, where the parties disagree

21  on certain factual information, it would be helpful to

22  me.

23          I'm familiar, generally, with the materials that

24  Mr. McCabe has developed, the learning materials, over

25  my -- my brief review of that information.

1          Can you tell me a little bit more about Mr.
2   McCabe, his historical background and his development of
3   the works?
4          MS. WOODROW:  Yes, your Honor.
5          THE COURT:  If you would like to use the
6   podium --
7          MS. WOODROW:  Certainly.
8          THE COURT:  -- it's probably helpful.
9          MS. WOODROW:  Fine.  Thank you, your Honor.
10          Yes, Mr. McCabe was -- is an educator and he was
11   trained, I believe, in English and in the reading skills
12   and he was a teacher of English in high school, then was
13   transferred to another -- to junior high, I believe, and
14   for more disadvantaged -- more disadvantaged students.
15          And in that quest, he discovered that many of
16   the students were not able to read.  He thought about it,
17   discussed it and learned that how he had learned to read
18   as a dyslexic was the way that he could then teach the
19   dyslexics because many of the youngsters that could not
20   read were dyslexic.
21          He developed a system.  He worked on it several
22   summers and created the first book, the first couple of
23   books, Sequential Spelling, and from there, he has
24   developed a whole series of books.  He copyrighted them
25   in the late '70s.

8

1          THE COURT:  They were not registered.

2          MS. WOODROW:  Pardon?

3          THE COURT:  Copyrights were not registered.

4          MS. WOODROW:  They are registered.

5          THE COURT:  They are.

6          MS. WOODROW:  Yes.  We have a stack of ancient

7    documents here.  We have the original registrations with

8    us, your Honor.

9          THE COURT:  Would the copyright dates predate

10   1978?

11         MS. WOODROW:  Yes.  They -- they come under the

12   '95 years.  I can look in my book but they are covered.

13   They are still valid.  They did not need to be renewed.

14   There was a window during which they needed to be renewed

15   and these do not fit within that window.

16         THE COURT:  I see your opposing counsel

17   squirming in his chair.

18         MS. WOODROW:  Pardon?

19         THE COURT:  I see your opposing counsel

20   squirming in his chair.

21         MS. WOODROW:  He probably may disagree with me.

22         THE COURT:  Indeed.  So what was he doing during

23   the period of time?  Who was he working for when most of

24   these -- the work was completed on --

25         MS. WOODROW:  I believe the Flint school system.

9

1          THE COURT:  As soon as he had registered them or

2    at least sometime thereafter, AVKO was created.

3          MS. WOODROW:  Correct.  He then transferred

4    the -- he transferred and assigned the -- the copyrights

5    to AVKO and I don't have the exact date of that but I can

6    get that for you.  That's in my documents.  He assigned

7    them to AVKO and then began to publish them and print

8    them through AVKO.  And distribute them and sell them and

9    market them.

10          THE COURT:  What -- what is AVKO?

11          MS. WOODROW:  AVKO is a non-profit educational

12    foundation and the purpose is not only to further reading

13    but other educational opportunities and -- opportunities

14    and techniques.

15          He is hoping to have a summer camp to teach

16    teachers how to teach reading and to also help the

17    children how to learn how to read.  He is also -- they

18    wish -- there are other opportunities and other projects

19    that AVKO wishes to go into but, of course, they have

20    not -- they have been stopped by it because of the lack

21    of funding.  They expected to have funding through the

22    sale of the publishing rights and they have not been

23    able -- since the sale has not occurred, they haven't

24    been paid.  They can't go forward in any of these

25    educational ventures.  I would have to ask Mr. McCabe in

10

1   greater detail about those.

2          THE COURT:  What -- what is AVKO under state

3   law?  Is it a --

4          MS. WOODROW:  It's a 501c.

5          THE COURT:  That's its federal designation.

6          MS. WOODROW:  And you know, I don't know, but it

7   is -- I can ask Mr. McCabe.  He would have that

8   information.  But it is a tax-free foundation.

9          THE COURT:  Is it a membership or a directorship

10  non-profit organization?

11         MS. WOODROW:  It has members and it also had a

12  board of directors.

13         THE COURT:  Okay.  It's nevertheless

14  incorporated as a non-profit under state law.

15         MS. WOODROW:  That's what my understanding is.

16         THE COURT:  Under the Internal Revenue Service

17  code, is it a private foundation or is it simply exempted

18  from income tax under 501c3?

19         MS. WOODROW:  It's a public foundation.

20         THE COURT:  Okay.  You indicated that the

21  works would have been completed sometime, what, in 2008,

22  2009?

23         MS. WOODROW:  Works was completed?

24         THE COURT:  Mm-hmm, as a -- as a commercial body

25  of materials that could be published.

11

1            MS. WOODROW:  I think it was published -- they
2    were being published early, many, many years ago.
3            THE COURT:  How long ago?
4            MS. WOODROW:  I can't speak to that.  Mr.
5    McCabe, when was Sequential Spelling first published,
6    19 --
7            MR. McCABE:  1975, I believe.
8            THE COURT:  All right.
9            MS. WOODROW:  And continuously thereafter?
10           THE COURT:  And what --
11           MR. McCABE:  There is -- there are all kinds of
12   books that were published all along the way.  I didn't
13   get to be able to do these (indicating) in one summer's
14   time.
15           These contain all the words of the English
16   language except those which you find on bathroom walls.
17   I left those out and the very esoteric scientific and
18   medical terminology.  Other than that, it contains all
19   the words of the English language arranged by patterns
20   and those that have no patterns, that I call the outlaw
21   or insane words, they are -- they are all put together
22   according to basic usage.  In other words, I would have
23   words like "was" long before I would have L-O-U-G-H,
24   lough, long before I would have Q-U-A-Y-D.
25           THE COURT:  Mm-hmm.  What was the commercial

12

1  viability of these works, if you will, between, let's

2  say, 1980 and the early 2000s?  Were they assigned to

3  AVKO at a particular period of time?

4         MS. WOODROW:  I believe they were assigned to

5  AVKO and developed and some of the -- some parts were

6  developed by AVKO, additional parts, and they were always

7  commercially available by AVKO.

8         THE COURT:  And I understand where the human

9  capital came from.  It's standing over here.  Where did

10  the operating capital come from that enabled the

11  gentleman --

12         MS. WOODROW:  The funding?

13         THE COURT:  -- to have AVKO --

14         MS. WOODROW:  The funding, your Honor?

15         THE COURT:  -- actually publish those materials,

16  yes.

17         MR. McCABE:  It came from my cashing in of my

18  pension.  So I have no pension.  It came from my wife's

19  very generous donations to the foundation and, of course,

20  from the sales and occasional grants, for example, the

21  Newman -- Paul Newman Foundation.  That was a grant and I

22  forget a couple other foundations have given us small

23  grants.  But that's where most of the funding has come

24  from, is from private donations and from sales of the

25  materials to try and keep us going.  I have not collected

13

1  a single cent in salary.

2          THE COURT:  Tell me a little bit about the sales

3  experience that you had with the materials before it was

4  assigned to AVKO and after it was assigned.

5          MR. McCABE:  I'm sorry.  My hearing is not very

6  good.

7          MS. WOODROW:  Did you -- I don't believe that he

8  sold -- did you sell any materials before they were

9  assigned to AVKO?

10          MR. McCABE:  No.  No.  Wait a minute.  No, no, I

11  didn't.

12          THE COURT:  And how about afterwards?

13          MR. McCABE:  After I assigned the copyrights to

14  AVKO, then we sold and could not have any direct profits

15  coming to me directly from the foundation.  I cannot -- I

16  cannot profit as an individual and I have not.  That, of

17  course, has made it very difficult.  You cannot really

18  raise money by having stock because you can't do that.

19  And to borrow money from banks, that was pretty much out

20  of the question.

21          THE COURT:  Well, I'm a bit at a loss of

22  understanding why you transferred the copyrights to a

23  charitable organization as opposed to a for profit

24  entity.

25          MR. McCABE:  Oh, as opposed to a for profit?

14

1          THE COURT:  Yes, sir.

2          MR. McCABE:  Well, at the time, there wasn't any

3  for profit organization that I could sell them to and I

4  can explain why, because everything that I have developed

5  for the foundation cannot be found anywhere, anywhere, in

6  the educational world.

7          These are things that I developed because I am a

8  dyslexic.  Those who develop reading materials are not

9  dyslexic and as you perhaps know the adage, those who can

10 do and those who can't teach.  Well, those who can't

11 teach cannot handle a classroom.  They get their Ph.D.s

12 and they teach the teachers how to teach and they are the

13 ones that the publishers go to to create their works and

14 how to teach kids how to read.

15         THE COURT:  Now --

16         MS. WOODROW:  But Mr. McCabe --

17         THE COURT:  -- how did you make the decision to

18 create a non-profit entity that obtained its charitable

19 exemption from taxation to be the recipient of that

20 intellectual property rather than simply capitalizing on

21 it in a profit organization?

22         MR. McCABE:  Because according to the law, as

23 it was read to me or explained to me by my attorney,

24 my copyright attorney, that I could not profit from a

25 sale of the copy -- from the books if AVKO published

15

1  them.

2         MS. WOODROW:  I think, Mr. McCabe, the question

3  is, why didn't you form a real company called Sequential

4  Spelling, Inc., that would sell them for money for profit

5  so that you could make a profit?

6         MR. McCABE:  Because I was not interested in

7  making a whole lot of money.  I was interested in getting

8  the word out.  And at the time, I felt this was the

9  proper way to go.  It may -- may have been the wrong way

10 to go.

11        THE COURT:  Well, you had made the point to me a

12 few minutes ago that your wife had -- was -- had made

13 some financial contributions and that you had exhausted

14 portions of your pension in order to develop this -- this

15 intellectual property.

16        MR. McCABE:  Yes.

17        THE COURT:  Why would you put it in a charitable

18 organization that you could not personally benefit from

19 given the fact that you had all this invested material?

20 Had you deducted the charitable contributions that you

21 had made and utilized that as an offset against your

22 reported income to the Internal Revenue Service?

23        I'm trying to understand what your strategic

24 motives were given the fact that you and your wife had

25 invested a fair amount of effort in this and yet you

16

1   created a public charity from which it would be difficult

2   to recover any of that investment.

3        True?

4        MR. McCABE:  My intentions were never to make a

5   whole lot of money, never.  And I felt that the best way

6   at the time was to be a non-profit organization that

7   would be -- would carry, let's say, a little more respect

8   trying to get the word out to the educational

9   establishment than a private money-making corporation in

10  which their whole object is the bottom line.

11       My object was never the bottom line but that is

12  what it is in a -- a corporation such as Wave 3.  And I

13  have no qualms about them making money.  I hope they

14  would make a whole lot of money but they could -- they

15  were in a position, I felt, to make a lot of money -- not

16  actually Wave 3.  It was Home School Holdings at the

17  time.

18       THE COURT:  What kind of reportable revenue are

19  we talking about for the third parties are willing to pay

20  for the published works between 1980 and 2006?  Are we

21  talking about an income stream in the range of thirty

22  thousand, sixty thousand, two hundred sixty thousand, two

23  million six hundred thousand?

24       MR. McCABE:  I'm not sure of the amounts.  It's

25  certainly less than three hundred thousand from the -- of

17

1  any of the years between there.

2         THE COURT:  Less than three.

3         MR. McCABE:  My guess would be somewhere in the

4  neighborhood as we're going up between those years, it

5  would average probably around a hundred twenty-five, a

6  hundred fifty thousand.

7         It didn't really go up until we were picked up

8  by Sonlight Curriculum, as far as just the Sequential

9  Spelling and they picked it up because their -- they had

10 used it with their own children and because it worked so

11 well with them, they were willing to contact me and ask

12 me if I would change a little bit of the format from the

13 one page across to a two-column introduction and make a

14 few minor changes.  They arranged for a publish -- for a

15 printer.  They arranged for the printer to give AVKO

16 credit and arranged --

17        THE COURT:  And my memory and in briefly

18 reviewing this within the short conference that I've had

19 with counsel was that the numbers ranged between about

20 sixty and two hundred thousand, that that range was --

21 captures the revenue stream fairly accurately.

22        MS. WOODROW:  I think the maximum revenue was

23 around $291,000.

24        THE COURT:  Okay.  I recall that.  And a

25 number of years that it was around eighty or less, more

18

1    or less.

2              MS. WOODROW:  That I don't know, your Honor.

3              THE COURT:  Okay.  That now takes us then, to

4    some degree, to 2010.  Can you tell me what happens in

5    2010 that's relevant to the case?

6              MS. WOODROW:  That is relevant to the case?  In

7    2010, a contract is signed -- well, it actually begins in

8    June of 2009 when Mr. Morrow and Mr. McCabe meet at a

9    convention or at some sort of a show for products and

10   part of the purpose of Mr. Morrow going to the shows was

11   to find small companies that he could acquire for Home

12   School Holdings.

13             And Home School Holdings was at that time

14   coordinating with Narayan, to purchase Narayan as a

15   company because it was already public-oriented somehow,

16   so that they could create a public offering of Home

17   School Holdings in order to gain income.  And their first

18   SEC S-1 was for fourteen million dollars.  That was in

19   July of 2009.

20             Mr. Morrow opened up negotiations with Mr.

21   McCabe and they had contracts, went back and forth and

22   they talked about -- the contracts went back and forth,

23   with changes and changes until finally, they signed a

24   contract on June 4th, 2010.

25             Prior to that signing, Mr. Morrow indicated that

19

1  he would be signing as an individual but yet, he signed

2  it under the title of CEO of Home School Holdings, Inc.

3  There is some dispute as to whether or not he had actual

4  authority at the moment of signing.  But he does not

5  discount or abrogate the contract.  He actually lived by

6  the contract.

7           THE COURT:  Can we stop there for a moment.

8           MS. WOODROW:  Yes, your Honor.

9           THE COURT:  The contract is signed on June 4 of

10  2010.  You indicated to me that Mr. McCabe met Mr. Morrow

11  in approximately June of 2009.  Where did they physically

12  meet?  What was the first instance in which --

13           MS. WOODROW:  In 2009?  At a show, some sort of

14  show for schools.  Where did you meet, Mr. McCabe?

15           MR. McCABE:  At the Florida Family Education

16  Association.

17           MS. WOODROW:  In Orlando?

18           MR. McCABE:  A conference in Orlando, Florida.

19  I met him as I was -- I was looking for a distributor or

20  this is why I went to these.  Besides getting the word

21  out, I was looking for distributors.  That's how I found

22  Rainbow and Timberdoodle and a few of the others.

23           MS. WOODROW:  You had about 20 distributors,

24  didn't you, 18 to 20, that you had?

25           MR. McCABE:  I'm not sure how many.

20

1          MS. WOODROW:  Okay.

2          MR. McCABE:  But that's one of the reasons I was

3    there, to find a distributor and --

4          THE COURT:  Kind of like the way things are

5    set up here in the courtroom.

6          MR. McCABE:  And he said he was a --

7          THE COURT:  Bay City Convention Center.

8          MR. McCABE:  Right after the convention, he came

9    up to see the AVKO Foundation and to begin making a

10   proposal to purchase the publishing rights.

11         THE COURT:  Now, if I understand accurately, the

12   entrepreneurial objective up to that point was to find a

13   distributor with AVKO maintaining the copyrights for the

14   materials, producing a stream of income, that it was not

15   anticipated that Mr. McCabe would profit from.

16         Do I have this correctly?

17         MS. WOODROW:  Correct.  Mr. McCabe had prior

18   thereto been handling all the publishing, handling the

19   printing, handling the nuts and bolts and, you know, the

20   carrying and lugging of the boxes and seeing that they

21   got shipped and he wanted to -- what he calls the

22   publishing --

23         THE COURT:  But recognize, I think, that we need

24   to draw some distinctions here based on some decisions

25   that he had made.  He had developed an exceptional

21

1   product of particular value for certain students but he

2   elected to place it into a non-profit organization,

3   notwithstanding the fact that both he and his wife had

4   made very significant contributions to the development of

5   this product.

6          MS. WOODROW:  Correct.

7          THE COURT:  It was at that point not just his

8   baby.  It was the foundation's baby.

9          MS. WOODROW:  Correct.

10          THE COURT:  It had grown up and he had

11   transferred it to another organization.  Am I correct in

12   understanding that at least at that juncture, he had no

13   intention of profiting from this enterprise and that's

14   why he selected a non-profit organization.  It has limits

15   that are placed on the private inurement that go with

16   any non-charitable organization.

17          Am I correct at this stage?

18          MS. WOODROW:  Mr. McCabe?

19          MR. McCABE:  I wanted AVKO to profit from the

20   publishing by Home School Holdings.  I wanted AVKO to end

21   up with enough money to be able to help solve the

22   horrible literacy problem that exists in our country and

23   you can -- if you ever are curious, you can go to our

24   website and watch a small video which I take a dyslexic

25   who came to the foundation, and by the way, I have never

22

1   once charged one penny.  The AVKO Foundation does not

2   charge for its free daily tutoring or for the training of

3   parents on how to -- to tutor their own children.

4          This is a passion of mine and I don't think I

5   need to go into all of it.  If you want to find out

6   everything about how this came about, how the foundation

7   came about, it's in my book, "To Teach a Dyslexic."

8          Just like the idea it takes a thief to catch a

9   thief, it takes a dyslexic to know how to teach a

10  dyslexic.  And what I did in that video is take a kid

11  from Mississippi and I -- and I had his first lesson, I

12  had the video camera, I hired a small inner city -- what

13  was the name of the -- Inner City Productions, that's the

14  title, they were there to capture the very first lesson.

15  And at the start, I handed up a card that had a word

16  "malicious" on it and I asked him if he could read it.

17  He couldn't.

18          THE COURT:  And I appreciate that.

19          MS. WOODROW:  Mr. -- Mr. McCabe.

20          THE COURT:  Ma'am.

21          MS. WOODROW:  Oh.

22          THE COURT:  I have a great affinity for your

23  product.  As I've mentioned even to your attorney, both

24  the attorneys, I had a father that was dyslexic who

25  struggled with that for large portions of his life and

23

1    ultimately, after a great deal of struggle, was actually

2    able to capitalize on a lot of the strengths that he

3    developed as a result of it.

4            But I'm not asking you about your educational

5    product.  I'm asking you about your business decisions.

6    You had this product in a non-profit organization.  You

7    entertained at least -- counsel indicated, up to 20

8    different folks that had an interest in distribution but

9    at some point, you ended up in a conversation with Mr.

10   Morrow in Florida.

11           Why did you decide to continue the discussion

12   with Mr. Morrow rather than the other distributors?

13           MR. McCABE:  Oh.  Those were distributors,

14   not -- they were in the business of distributing from

15   many, many publishers.

16           THE COURT:  Yes.

17           MR. McCABE:  Now, he put on a great presentation

18   to me and I believed basically his presentation which,

19   when I saw on --

20           MS. WOODROW:  TV.  Osgood?

21           MR. McCABE:  On the --

22           MS. WOODROW:  Charles Osgood show?

23           MR. McCABE:  It was the -- what was the name.

24           MS. WOODROW:  The TV show?

25           MR. McCABE:  Yeah.

24

1          MS. WOODROW:  Charles Osgood.

2          MR. McCABE:  Charles Osgood.  When I saw on --

3   which you can watch right here, it's on --

4          MS. WOODROW:  TV, ABC, I think.  CBS.  One of

5   the national shows.

6          MR. McCABE:  -- the CBS show, it was almost word

7   for word, great presentation, and I believed him.  I

8   believed he could do what he said he could do.

9          MS. WOODROW:  Mr. McCabe.

10          MR. McCABE:  That he was --

11          MS. WOODROW:  Mr. McCabe.

12          MR. McCABE:  -- that he had an income in the low

13   millions and even at that time, I said -- I told him and

14   that's why I had the price rather low because just having

15   an income of a few million does not compare to the big

16   publishers.

17          THE COURT:  Now --

18          MR. McCABE:  I wanted him to really go with it,

19   make money for himself and make money for the foundation.

20   So the foundation could really do what I wanted it to do.

21   We're not basically just a publisher or a printer.  We

22   had -- there is not a single book here that can be found

23   anything like it anywhere.

24          MS. WOODROW:  But --

25          THE COURT:  Now, let's stop for a minute.

25

1          MS. WOODROW:  Thank you.

2          THE COURT:  Let's pick up with opposing counsel.

3          MS. WOODROW:  Thank you, your Honor.

4          THE COURT:  Let's talk about HSI and Mr. Morrow.

5    We've talked a little bit about Mr. McCabe.  Tell me a

6    little bit about Mr. Morrow and HSI, sir.

7          MR. DI GIACOMO:  HSH, your Honor, Home School

8    Holdings.  Mr. Morrow was the CEO, president, I'm not

9    sure what the official title was.  Was it CEO?  CEO of

10   Home School Holdings at the time.  Home School Holdings

11   was looking to acquire companies.  It current -- it

12   previously had a product, I believe, that was --

13         THE COURT:  Tell me a little bit more about Mr.

14   Morrow.  How --

15         MR. DI GIACOMO:  Sure.

16         THE COURT:  How old a gentleman was he at the

17   time, what was his educational and business experience?

18         MR. DI GIACOMO:  I would let him speak to that,

19   your Honor.

20         MR. MORROW:  Your Honor, I met Don in May of

21   2009 so I would have been 46 years old.  My educational

22   background is I have a BA and a MBA from the University

23   of Illinois.  My MBA focuses on finance.

24         THE COURT:  From where?

25         MR. MORROW:  From the University of Illinois,

26

1  Champaign-Urbana.

2          THE COURT:  Champaign-Urbana.  My wife got her

3  Master's there.  And after that, sir?

4          MR. MORROW:  In terms of education?

5          THE COURT:  Yes, sir.

6          MR. MORROW:  In 1995, I completed my CFA, having

7  passed in three consecutive tests and in 1999, I earned

8  my CMA which is basically the cost accounting equivalency

9  of a CPA.

10          THE COURT:  Employed where?

11          MR. MORROW:  When I first graduated from the

12  University of Illinois, I was employed by Motorola,

13  Incorporated.  I worked in their Asia-Pacific cellular

14  subscriber position until 1995.  From 1995 until 1997, I

15  contracted technology jobs.  I had wanted to learn about

16  the web and enterprise applications so I did some work in

17  that area.

18          THE COURT:  Technical side or finance side?

19          MR. MORROW:  Technical, sir.

20          THE COURT:  How did you develop those skills?

21          MR. MORROW:  While I was at Motorola, someone

22  had to do the digitization of some of our processes

23  specifically related to things like sales forecasting,

24  things like that that are extremely important when you're

25  in an industry like cellular.  We actually digitized that

27

1    using Motorola's propriety technologies.  It worked very

2    well.

3              But I really found I had a strong interest in

4    that so I spent the next two years doing contract work

5    for companies like Coca-Cola, CNA Insurance, places like

6    that.

7              In July of 1997, a group of three executives

8    that were about to start an energy marketing company

9    called People's Energy Services contacted me because they

10   wanted a CFO who was very tech savvy because in the

11   energy industry, the margins are very narrow and you've

12   got to make sure that you squeeze every penny out of

13   every dollar.  So for two years, I was the CFO there.

14             THE COURT:  And the name of that again was?

15             MR. MORROW:  People's Energy Services.  Our

16   largest equity investor was People's Energy Corporation

17   which you may have heard of.  It was recently acquired by

18   Wisconsin Public Service.  That company we created is

19   still a division of Wisconsin Public Service as something

20   north of a billion dollars in sales now.

21             THE COURT:  You were there approximately two

22   years?

23             MR. MORROW:  Just about exactly two years, sir.

24             THE COURT:  And then where?

25             MR. MORROW:  From there, I contracted with

28

1   Arthur Andersen which was kind of bad timing in that

2   regard and I served as a CFO for a start-up called

3   Preview Port.  Preview Port unfortunately came to an end

4   when its founder died suddenly of brain cancer.

5           MS. WOODROW:  I'm sorry?

6           MR. MORROW:  Preview Port.

7           MS. WOODROW:  Okay.

8           MR. MORROW:  I then worked in the effort to

9   build what was called a graduate facility for the

10  Illinois Medical District.  It's a -- I don't know how

11  familiar you are with the incubation of start-ups, your

12  Honor, but start-ups, typically when they are very small,

13  they go into what's called an incubator where they are

14  supported by either the state or by a foundation which

15  provides them office space and technical support and all

16  those kinds of things.

17          And then when they start to get sales and

18  they're a little larger but not really ready to be

19  independent yet, they move into a graduate facility.  The

20  IMD didn't have a graduate facility.  They wanted to

21  build one but they couldn't afford to fund one so for two

22  years, a partner and I worked on the attempt to raise

23  funds to build a graduate facility for the IMD.  We ended

24  up coming very, very close to getting it done but the

25  deal fell through at the last second which was very

29

1  disappointing.

2          THE COURT:  Who was going to fund it?

3          MR. MORROW:  Excuse me?

4          THE COURT:  Who was going to fund it?

5          MR. MORROW:  Cousins Properties out of Atlanta

6  was our largest equity provider.  It was slated to be

7  built in the City of North Chicago which is, as the name

8  says, north of Chicago.  It's where Abbott Labs is.

9  You're probably familiar with Abbott Labs.

10         The piece of land that we would have acquired to

11 build this facility is just across the street from Abbott

12 Labs.  The County of Lake was a participant, the City

13 of North Chicago was a participant until they withdrew

14 and sank the deal and the State of Illinois and the

15 federal government both would have participated at a

16 certain level.

17         THE COURT:  Offered explanation for withdrawing

18 funding?

19         MR. MORROW:  North Chicago was -- it was and is

20 a city that's struggling.  It's a very poor city.  They

21 are one of those cities that is somewhat similar to

22 Flint, that had a lot of industry and lost it.  Basically

23 all that remained in North Chicago was the presence of

24 Great Lakes Naval Training Center.  That's the only big

25 industry that remains but there used to be a lot of heavy

30

1  industry, specifically metal banding type industries,

2  brass foundries, steel foundries, that sort thing.

3       As soon as they saw that Cousins Properties was

4  happy to come in, they decided they didn't need to put

5  their six million dollars in anymore.  That angered

6  Cousins so much, they withdrew their participation

7  because as it was such a narrow profit margin to begin

8  with, Cousins' primary motivation of getting involved was

9  an opportunity to get into the business.

10      Cousins was very big in strip malls and other

11 large resale developments but they wanted to get into, at

12 the time, biotech space was very profitable and a lot of

13 it was being built.  They saw this as a way to get into

14 that side of the business.

15      THE COURT:  So what do you do when it blows up?

16      MR. MORROW:  You get very depressed.  I spent

17 two years working with the Salvation Army as their

18 director of audit.  It was a nice time for me to kind of

19 recover emotionally from that disappointment and to do a

20 lot of good work for a christian organization.

21      It was very nice because at the time, they were

22 going through a financial restructuring because that

23 division of the Salvation Army was really struggling

24 financially.  I can say quite happily and proudly that we

25 did turn it around and that their finances were on a

31

1  sound footing when I left to form Home School

2  Incorporated which became Home School Holdings.

3        THE COURT:  And that would have been

4  approximately what period of time?

5        MR. MORROW:  That would have been July of 2006.

6        THE COURT:  Tell us about HS -- counsel

7  corrected me here, HSI.

8        MR. MORROW:  HSI was the original corporation

9  formed in October of 2005.  I joined it permanently in

10  July of 2006.  Our goal was to create a one-stop shop

11  where home-educated families could get all the resources

12  they needed to successfully educate their children.

13        THE COURT:  What was HSI?  Was it a for profit

14  enterprise?

15        MR. MORROW:  Yes, sir.  It was Delaware C.

16        THE COURT:  Delaware C.  Who were the equity

17  participants?

18        MR. MORROW:  The original founders were myself

19  and David Nicholson who is here in the courtroom.

20        THE COURT:  Relative equity holdings as between

21  you and David?

22        MR. MORROW:  Seventy-two/twenty-eight, naming me

23  first.

24        THE COURT:  David was 28.

25        MR. MORROW:  Correct.

32

1          THE COURT:  You were 72.  How did you happen to
2    choose that?
3          MR. MORROW:  Um, somewhat arbitrarily, your
4    Honor.  We had worked together to fund another start-up
5    that tried to do something similar a little earlier and
6    it had -- it had not gone anywhere and we closed that
7    effort down so we kind of based it on to what we
8    contributed to the earlier effort.
9          THE COURT:  What kind of capital funding did it
10   require?
11         MR. MORROW:  Originally, about $100,000.
12         THE COURT:  And how did you raise the money?
13         MR. MORROW:  It was by my personal funds and
14   David's personal funds.
15         THE COURT:  Roughly seventy-eight thousand of
16   your funds and twenty-eight of David's?
17         MR. MORROW:  It was a little higher, probably
18   about 75/25 but we negotiated down to 72 and 28.
19         THE COURT:  How do things go in 2006, 2007?
20         MR. MORROW:  It was very, very slow and very
21   difficult.
22         THE COURT:  Tell me what your business objective
23   was.
24         MR. MORROW:  Our business objective was to
25   create an online presence that would enable people to

33

1  purchase all the curriculum and services they needed

2  online as opposed, for example, of going to a bookstore.

3       We also provided -- intended to provide

4  services, home education is a legally-regulated activity

5  so -- and the law is very, very different state by state

6  so for example, to provide legal resources.

7       The first project we undertook was called PER.

8  We developed an online organizational tool that would

9  allow parents to schedule their children's instruction

10 but then also use that as documentation that they could

11 provide to the state in those states that require the

12 documentation of activities, materials used, time spent,

13 sometimes referred to seat hours, et cetera.

14      When we first launched PER, it was very

15 successful.  We brought it out in January of 2007.

16 Before 2007 was over, we had more than 36,000 users of it

17 worldwide.  We had them in all 50 states of the United

18 States, every province of Canada and I think 44 foreign

19 countries.  We offered that free as the enticement to get

20 people to come in and purchase from us.

21      THE COURT:  And what was the title of the

22 product that you branded it with?

23      MR. MORROW:  It was called PER, sir, stands for

24 Plan, Educate, Record.

25      THE COURT:  And not unusually, you didn't charge

34

1   for the utilization of the product, correct?

2           MR. MORROW:  Correct.

3           THE COURT:  But how does the business model

4   work?

5           MR. MORROW:  The goal was to -- once we had them

6   on our site, we also would present them -- we also

7   presented an online store where they could purchase -- I

8   think, when we first built it, we had 36,000 different

9   items that we used by drop shipping through STL and, I

10  can't remember the other name of the other distributor we

11  used.  We also sold advertising, obviously, like a great

12  many online locations do.

13          But our primary goal was to, by enticing people

14  in, we would sell them materials they needed.  We tended

15  to offer them as a very, very, competitive price.  It's a

16  very simple model, really, very common to the web where

17  you draw someone in with a free application and then you

18  sell them some other service or a product.

19          THE COURT:  What kind of revenue in 2007?

20          MR. MORROW:  I think we must have had something

21  like $50,000.  We really struggled, your Honor.

22          THE COURT:  That's gross rev.

23          MR. MORROW:  Yes, sir.

24          THE COURT:  2008?

25          MR. MORROW:  Um, I would say probably may have

35

1  gone to 90 or so.  It's still quite light.

2          THE COURT:  Does HSI need more working capital

3  in 2007 and eight?

4          MR. MORROW:  Yes.  We were continuously drawing

5  in capital, your Honor.

6          THE COURT:  So how do you raise working capital?

7          MR. MORROW:  I'm sorry, sir?

8          THE COURT:  How do you raise working capital?

9          MR. MORROW:  We approached individual investors

10 most of whom were accredited investors.  This is where

11 Mr. Nicholson and his partner, Mr. Lydecker, were

12 especially effective because they have a lot of

13 relationships with well-to-do people.  Very, very typical

14 start-up story.  The friends and family were large

15 contributors.

16         THE COURT:  And how did you manage the

17 investment transactions?  Were these exempt -- exempt

18 from securities registration?

19         MR. MORROW:  Yes, sir.  Each investor, when they

20 expressed an interest in investing, was provided a

21 subscription agreement which they were required to sign.

22 We kept a subscription agreement on record for each and

23 every investor who came to us.  Once we -- once an

24 investor joined the company, they received quarterly

25 reports that included financials.  That's how we managed

36

1   our investors.

2           THE COURT:  Had you expanded the board of

3   directors as you sought out additional private investors?

4           MR. MORROW:  Yes.

5           THE COURT:  And who became involved in your

6   board?

7           MR. MORROW:  Yes, sir.  Obviously, Dave and I

8   were the sole directors at the founding of the company.

9   In March of 2006, his partner Ken Lydecker joined the

10  board.  Shortly thereafter --

11          THE COURT:  What was Lydecker's first name?

12          MR. MORROW:  Kenneth.  Shortly thereafter, a

13  securities attorney who worked with me on the IMD

14  project, by the name of Chris Davies, joined our board.

15  And that size of four was a good -- a good workable

16  size.

17          THE COURT:  Four people.

18          MR. MORROW:  Correct.

19          THE COURT:  I've not had a chance to go through

20  the exhibits but I note, for example, we've got HSI.

21          What is HSH?

22          MR. MORROW:  HSH is a Florida C that was formed

23  when HSI and Narayan Capital Corp merged.  Chris Davies,

24  our board member who is also a securities attorney, had

25  strongly advocated that since we were having a very

37

1  difficult time raising large amounts of capital, which

2  would have clearly facilitated the development of the

3  company, he had suggested and had a great deal of

4  experience in taking very small companies into the public

5  markets, not the -- the bulletin board as opposed to the

6  pink sheets, and used that method with parties with whom

7  he had worked with several times to raise large amounts

8  of capital.

9          Our challenge had been continuously, we always

10 had a little money and we really needed a time when we

11 had enough money where we could plan forward and execute

12 on more difficult larger projects.

13         THE COURT:  And what was the equity holding of

14 HSH, wholly-owned affiliate by HSI?

15         MR. MORROW:  Yes -- the other way around, HSI

16 was a wholly-owned of HSH.

17         THE COURT:  So you and David contributed your

18 stock together with any of the other private investors

19 that you picked up along the way to -- essentially, it

20 would have been an exchange of HSH stock for HSI.

21         MR. MORROW:  That's correct, sir.

22         THE COURT:  At the time you created HSI, what --

23 how much had your stock holding and David's stock holding

24 been diluted by the addition of additional equity

25 participants?

38

1              MR. MORROW:  At the time of the HSH transition?

2              THE COURT:  Yes.

3              MR. MORROW:  I was down to, I think, 51 or 52.

4    I think Dave was down to 16 or 18 and -- and just so that

5    you fully understand, we had contributed additional

6    capital ourselves since then so the actual delusion from

7    the original investment was considerable.

8              THE COURT:  Had you borrowed money or did you

9    have some savings?

10             MR. MORROW:  I had some savings and I borrowed

11   some funds, also, from members of my family.

12             THE COURT:  Did the four-person board for HSH

13   also become a four-person board for HSI?

14             MR. MORROW:  Other way around, your Honor.  HSI

15   became HSH, yes, you're correct.

16             THE COURT:  Well, maybe I misunderstand the

17   transaction.  My understanding was that you created HSI

18   and that it became the -- that HS --

19             MR. DI GIACOMO:  HSH became the holding company,

20   your Honor.

21             THE COURT:  Yep, got it.

22             MR. MORROW:  Okay.

23             THE COURT:  But you essentially would have

24   flip-flopped the board.

25             MR. MORROW:  Yes.

39

1          THE COURT:  They became the board for both

2     entities.

3          MR. MORROW:  Correct.

4          THE COURT:  And how were you going to raise

5     capital?  What was the vehicle by which essentially

6     creating a holding company enabled you to raise larger

7     amounts of capital?

8          MR. MORROW:  We had already made application to

9     the SEC to become a public company and we had a five

10    million dollar commitment from a company called Tangiers

11    which was a hedge fund, that they would use to contribute

12    once we would become a public company.

13         THE COURT:  You obviously provided Tangiers with

14    a business plan that A, required five million dollars and

15    B, kept them in the game.

16         MR. MORROW:  Correct.

17         THE COURT:  What was it?

18         MR. MORROW:  Our intention was, as I think as

19    Don described quite accurately, was to acquire existing

20    streams of revenue from existing product lines that had

21    demonstrated their quality in the marketplace and to

22    enrich them, in terms of their sales, but also to improve

23    their value but combining them with other curricula to

24    create a more comprehensive curriculum.

25         Our ultimate goal was to create a one-stop

40

1   curriculum where a parent could come, make one decision,

2   purchase one package and have their entire curriculum.

3   It's very similar to, your Honor, you may have heard the

4   company K-12.  It's very similar.  They do the same

5   thing.  Sonlight which Don mentioned, uses the same

6   thing.  Timberdoodle does something sort of similar.

7   There are several companies that do that and have been

8   very successful at it.

9          THE COURT:  Why did the business plan require

10  five million dollars?

11         MR. MORROW:  That was primarily for the

12  acquisition of those existing product lines and a pretty

13  strong advertising campaign.  What we discovered early on

14  was that the fact that we were not very effective in

15  terms of promotion because we didn't have a lot of

16  resources to promote was a real challenge for us so

17  additional funds to ramp up that promotion would have

18  been very useful.

19         THE COURT:  And how was the transaction with

20  Tangiers going to be structured?

21         MR. MORROW:  It was structured -- they become

22  equity investors, similar to everyone else.  They would

23  take the -- it was kind of, think of it as an IPO in slow

24  motion, your Honor.  In a typical IPO, Lehman Brothers or

25  someone will just -- excuse me, will just drop a hundred

41

1  million shares on the market all in one day.  Tangiers'

2  plan was to drop ten thousand shares a day over the

3  course of a year, that sort of process.  So that as you

4  can imagine, a very thinly-traded young stock doesn't

5  suddenly lose all its value and then as they put it to

6  the market, we would then receive the proceeds less their

7  cut.

8          THE COURT:  And you had gotten as far as putting

9  together the IPO materials for registration?

10         MR. MORROW:  That I do not know, your Honor.  We

11  had been in the S-1 process for a while and I don't know

12  if you're familiar with it or not but we had gotten down

13  to the point where we had six to nine comments on our

14  comment letters so we were pretty close.  But we never

15  got past that six to nine hurdle and we were in

16  registration something north of two years, your Honor.

17         THE COURT:  Is Tangiers located in New York?

18         MR. MORROW:  They are actually located in San

19  Diego.

20         THE COURT:  And how involved were they in the

21  S-1 process?

22         MR. MORROW:  Almost not at all, your Honor.

23         THE COURT:  And what was the documentation of

24  Tangiers' commitment to HSI?

25         MR. MORROW:  HSH.

42

1          THE COURT:  HSH, once you had completed the --
2    once you had completed the S-1 process?
3          MR. MORROW:  Actually, we already had an
4    agreement that was about -- a placement agreement that
5    was about this thick (indicating) so I didn't think there
6    was going to be any additional documentation because we
7    were public, because we had done it ahead of time, so
8    everyone would understand what would happen once shares
9    hit the market.  We already had a market maker, Island
10   Securities.  We were already registered at FINRA so we
11   had most of the bases covered, except getting past the
12   SEC.
13         THE COURT:  Was that the problem?
14         MR. MORROW:  Yeah.
15         THE COURT:  And what were the major comment
16   problems that stalled the SEC?
17         MR. MORROW:  We typically would get a comment or
18   two on some of the more esoteric accounting issues.
19   Other than that, they -- misprints, explain this idea
20   further, those kinds of things.  The SEC comments are
21   somewhat interesting, your Honor.  They can vary from,
22   "You forgot to put a period on a sentence" to "We
23   completely disbelieve what you've told us," and anything
24   in between.
25         THE COURT:  It nevertheless impacts Tangiers'

43

1  funding.

2          MR. MORROW:  I don't believe so, your Honor,

3  because I don't think they actually commit -- put --

4  segregated some funds to commit to us.  Their process

5  allows them to use relatively little capital in order to

6  manage because of an IPO in slow motion, it's not like

7  with Lehman, Merrill Lynch, who has to have five hundred

8  million dollars set aside.

9          THE COURT:  They don't have to underwrite it.

10         MR. MORROW:  Right.  There's very little

11  underwriting.  It's not zero, your Honor, but it's a

12  small number.

13         THE COURT:  But the transaction is never

14  completed.

15         MR. MORROW:  No, sir.

16         THE COURT:  Why did this one blow up?

17         MR. MORROW:  I'm sorry, what was that?

18         THE COURT:  Why did this one blow up?

19         MR. MORROW:  We had gotten to the point where we

20  had been in registration over two years.  We thought it

21  would be very valuable in dealing with the SEC to develop

22  more significant revenue.  We came to the point where

23  we -- within the board, we just developed what we called

24  the restructuring plan, sometimes also called the baby

25  steps plan.

44

1          Our goal was to acquire one or two or three

2   product lines that had significant -- not huge but

3   significant sales so we could continue to fund the

4   registration process but also start to generate and

5   demonstrate more realistic revenue.

6          The problem was the restructuring plan had three

7   elements, all three of which had to work.  The first was

8   the acquisition of the AVKO product line.  It was

9   important because, A, it provided cash flow.  We expected

10  it would be three hundred thousand.  That's what we were

11  told.  And also give us a lot of credibility.  We needed

12  to get our --

13          THE COURT:  What -- what due diligence had you

14  done with respect to that representation?

15          MR. MORROW:  We had actually sold Sequential

16  Spelling as our product for several years.  We requested

17  financials of Don several times.  He represented he

18  didn't have them available or couldn't make them

19  available.  Given the small size of the product line and

20  the structure of the offer we made him, I wasn't overly

21  worried about it.  The number he gave me seemed credible

22  from what I knew about the market.  If he told me he had

23  a million dollars in sales, I would have had a much

24  different response.  There were concerns about that, your

25  Honor.  But I would never have guessed that the number

45

1   was one-third of what I was told.

2          THE COURT:  Why did you like his product?

3          MR. MORROW:  Your Honor, Don mentioned that we

4   met at FPEA which is one -- it's about the second largest

5   home school showing in the nation.  When you talk to

6   people about Sequential Spelling who are in home

7   education, it's very well-known and it has a lot of

8   people who really love it because it is a great product,

9   a great product, and when you ask a user about it, they

10  gush.  They love it, it's a great product.  My child

11  could not learn to spell until he got this and now he can

12  spell.  And that was the kind of product I wanted to

13  sell, was something that I could stand up in front of

14  someone and be very proud to represent.

15         THE COURT:  Now, the transaction with Tangiers

16  and the problems with the registration statement --

17         MR. MORROW:  Yes.

18         THE COURT:  -- are occurring in summer of

19  '06 -- no, they would actually have been continuing until

20  '08.

21         MR. MORROW:  It would have been in 2009, your

22  Honor.

23         THE COURT:  Okay.

24         MR. MORROW:  We didn't start the registration

25  process until we had been in existence 18 to 24 months.

46

1          THE COURT:  You were permitted under your

2   current comment period to continue to conduct business in

3   the manner of acquiring intellectual property that AVKO

4   presumptively had to sell.

5          MR. MORROW:  Yes, your Honor.

6          THE COURT:  How does that transaction get

7   structured in June?

8          MR. MORROW:  I had structured it so that I

9   offered him one-sixth of the total in cash and

10  five-sixths in stock.  The shares were to be registered

11  shares which is why we needed him to sign a subscription

12  agreement.  A registered share, as I'm sure your Honor

13  knows, is one that can be sold publicly eventually once

14  an entity becomes public.

15         THE COURT:  It was a six hundred thousand dollar

16  purchase price.  The fifty was in cash.  The

17  representation would be in $250,000 in marketable HSH

18  stock?

19         MR. MORROW:  Would be in stock that would become

20  marketable once HSH would pass through registration,

21  absolutely, yes, your Honor.

22         THE COURT:  And the second stage to the

23  transaction were an additional three hundred thousand

24  would be paid.

25         MR. MORROW:  Presuming that the transaction

47

```
 1   achieved three hundred thousand in sales, we would do the
 2   same amount again.  So another fifty thousand in cash and
 3   another two hundred fifty thousand in shares.
 4              THE COURT:  Any conditions?
 5              MR. MORROW:  Other than having to make three
 6   hundred thousand in sales, no, your Honor.
 7              THE COURT:  That was a condition --
 8              MR. MORROW:  That was the condition.
 9              THE COURT:  -- to the second -- to the second
10   stage of the funding?
11              MR. MORROW:  Correct.
12              THE COURT:  To what extent did you explain to
13   Mr. McCabe that you didn't have $600,000, that you
14   were -- that you were relying on the completion of the
15   transaction with Tangiers and the IPO funding over a
16   period of time?
17              MR. MORROW:  Don and I actually had a relatively
18   lengthy conference on September 22nd of 2009.  He and his
19   grandson Brian, who is the gentleman that is not here
20   today, had gone through our S-1 the day before, so that
21   he could see all the financials and he had some strong
22   concerns which he made clear to me.
23              THE COURT:  How did he get the S-1?  Did you
24   give it to him?
25              MR. MORROW:  It was available online, your
```

48

1   Honor.

2        THE COURT:  Sure, that part I understand but I

3   guess my question is, had you printed a copy and

4   furnished it to him so that he had an understanding for

5   the way you intended to structure the transaction and his

6   payment?

7        MR. MORROW:  I had not provided him one at that

8   time.  Bearing in mind, your Honor, this is nine months

9   before we did our transaction.  We were still discussing

10  the transaction at the time.

11       THE COURT:  Okay.  And by that, you mean your

12  transaction with Mr. McCabe.

13       MR. MORROW:  Correct.

14       THE COURT:  Okay.  What happens between then and

15  June of 2010?

16       MR. MORROW:  We were waiting for a time when we

17  felt we were in a position to complete the transaction.

18  As I've said, we were constantly having to manage our

19  cash very closely and the $50,000 payout wasn't -- I

20  mean, we weren't yet ready to make that as opposed to do

21  other things with the money like to continue to fund

22  registration.

23       THE COURT:  Lots happened in that time period,

24  though.  Lots of things happened.

25       MR. MORROW:  We continued the registration.  I

49

1   think we did three or four more S-1 comment letters.
2   Raised more cash on a typical ongoing basis for us.
3   Operationally, not a lot changed.  It's about that time
4   we started delivering the legal information on our
5   website.  That's about it.  Other than that, we were
6   really focused on getting the registration done.
7        THE COURT:  Well, what would your balance sheet
8   have looked like in early 2010?  What -- what would it
9   have reflected as -- what would it have reflected?
10        MR. MORROW:  It looked like a young company that
11  needed a lot of money.  We were -- had significant
12  accumulative deficit, clearly.  We had significant debt
13  but almost all of our debt was to internal parties, large
14  shareholders.  That's important because that's a second
15  element of our restructuring plan, was that the large
16  debt would be converted into equity before we proceeded
17  into the slow motion IPO.
18        THE COURT:  So in addition to the equity that
19  you had sold to these investors, there came a point in
20  time where you had to borrow additional sums from some of
21  those folks.
22        MR. MORROW:  Correct.  Some elected to make
23  their investments in the form of debt rather than equity.
24        THE COURT:  And what kind of numbers are we
25  talking about?

50

1              MR. MORROW:  Somewhat north of a million, I

2     would say, your Honor.

3              THE COURT:  Not an insignificant sum of money.

4              MR. MORROW:  No, sir.

5              THE COURT:  And how is that working capital

6     being used at that juncture?

7              MR. MORROW:  Almost exclusively for continuing

8     to operate the website and undertake the registration

9     activities.

10             THE COURT:  And how about compensation for you

11    and David?

12             MR. MORROW:  David was completely uncompensated

13    other than a thousand dollars worth of shares a month in

14    exchange for his service on the board.  At that time, I

15    was typically uncompensated in cash but I also received

16    shares and the company accrued debt in the form of my --

17    what would have been my cash portion of the -- of

18    compensation.

19             THE COURT:  I can remember back in practice when

20    I would represent a client that didn't have anything

21    other than a piece of art to contribute as a fee.  My

22    wife never liked to see me come home with a piece of art.

23    She commented about the fact that it was hard to eat.

24    You're in kind of an extreme set of circumstances at that

25    juncture.  This deal has got to close.

51

1          MR. MORROW:  That's true, your Honor.

2          THE COURT:  Mr. McCabe thinks that you're going

3    to write him a check for $50,000 and that you really do

4    have stock with a market value of $250,000.  Is that a

5    fair impression on his part?  Or is it from your point of

6    view, that you explained that you did not have that

7    stock, that it did not have that market value, it was

8    your hope that it would.

9          MR. MORROW:  I would say half -- half of the --

10   half of yes on the second one.  We were, on an ongoing

11   basis, still receiving investment so the way I conceived

12   of it, your Honor, was that Don would simply be another

13   one of those investors.  Those investors had been making

14   investments at a fixed price that we all accepted as the

15   value of the shares based on the opportunity that existed

16   before us.  And you're absolutely right, it is difficult

17   to eat until you get done with registration.

18         THE COURT:  What happens between June 4 and July

19   20 of 2010, to you?

20         MR. MORROW:  To me personally?  Our

21   restructuring plan's three legs basically fell apart.  As

22   soon as Mr. McCabe refused to sign his subscription

23   agreement, the second time, the deal with HSH is dead and

24   unfortunately, because the acquisition of the AVKO

25   product line was the linchpin in that restructuring plan,

52

1  the restructuring plan is dead.

2        Secondarily, the second leg of that

3  restructuring plan was me lending the $50,000 that we

4  were using to pay it, to HSH so it could then pay Mr.

5  McCabe his $50,000.

6        THE COURT:  But AVKO can't be the only

7  revenue-producing venture that you've got at that stage,

8  can it?

9        MR. MORROW:  It would have been -- at $300,000,

10  it would have been the largest, your Honor, far and away.

11  It was a very good opportunity for us.

12        THE COURT:  But you're more than a couple

13  million dollars into this project.

14        MR. MORROW:  You're right, your Honor.  In over

15  the four years, we had probably put in 1.8 million

16  dollars.

17        THE COURT:  And depending on how you look at it,

18  or higher, if you include both equity and debt.

19        MR. MORROW:  That would I think would be equity

20  and debt, your Honor.  I'm not certain.

21        THE COURT:  Okay.  How many investors do you

22  have breathing down your throat at that point?

23        MR. MORROW:  Well, I was blessed, your Honor.

24  None of them were breathing down my throat.  We had 75

25  investors, most of whom were related to a board member,

53

1  although about 20 were not.

2        THE COURT:  Which board member?

3        MR. MORROW:  Myself, Mr. Nicholson or Mr.

4  Lydecker.

5        THE COURT:  Again, what happens between June and

6  July?

7        MR. MORROW:  At that point, once the AVKO deal

8  with HSH falls through, and my agreement with the board

9  falls through, my CFO resigns which now means the third

10  leg of the restructuring plan which is going through

11  registration is now untenable.  So at that time, I

12  resigned.  I take the deal to Don as Wave 3 and that's

13  how we get here.

14        THE COURT:  What -- what has occurred with

15  respect to HSI and HSH?

16        MR. MORROW:  In what regard, your Honor?

17        THE COURT:  Chapter proceeding?

18        MR. MORROW:  No.  It's actually still operating.

19  They still have advertising revenue, still exists, still

20  presents PER to home educators.

21        THE COURT:  Who is operating it?

22        MR. MORROW:  A lady who worked for us then,

23  is -- continues to operate the site.  I'm not entirely

24  familiar with the operational details, your Honor,

25  because I've been out of it 19 months now, almost.

54

1   Or 18 months.

2           THE COURT:  Where were you physically living at

3   the time?

4           MR. MORROW:  Arlington Heights, Illinois, your

5   Honor.  Still live there.

6           THE COURT:  Nice drive.

7           MR. MORROW:  It was, your Honor.

8           THE COURT:  Well, by July, you and your wife,

9   if I remember the pleadings correctly, had organized Wave

10  3.

11          MR. MORROW:  Correct.

12          THE COURT:  And your idea was to see if you

13  could bail out the transaction.  Fair word?

14          MR. MORROW:  Yes, sir.

15          THE COURT:  I mean, it had failed with HSH and

16  HSI, with Mr. McCabe.

17          MR. MORROW:  Correct.

18          THE COURT:  So what do you do in furtherance of

19  that?

20          MR. MORROW:  I offer Mr. McCabe shares in Wave

21  3.

22          MR. DI GIACOMO:  Can you discuss the meeting

23  that you had with him at Tony's and the entire --

24          MR. MORROW:  Don and I went out to lunch for

25  the -- for the killer BLTs which he is very fond of.

55

1          THE COURT:  I couldn't hear that, I'm sorry.

2          MR. MORROW:  Mr. McCabe and I went out to

3    lunch -- I came to visit him and he and I went out to

4    lunch for the killer BLTs at Tony's because he likes

5    them.

6          THE COURT:  I still missed that.  What was --

7          MR. DI GIACOMO:  He said Tony's, your Honor,

8    Tony's in Birch Run.  The killer BLTs, your Honor.

9          MS. WOODROW:  It has a pound of bacon on it.

10          THE COURT:  All right.

11          MR. MORROW:  At that point, I had to make it

12    clear that -- he knew by then that HSH hadn't gone

13    through because he didn't sign the subscription agreement

14    but I had to make it clear that we had -- Wave 3 would

15    now take over.  I wanted to make sure that he felt

16    comfortable that, you know, A, he is still going to get

17    to retire, there would still be someone to take it over

18    and keep it going, keep the product line going.  And as

19    far as I know, he agreed to that.  He seemed comfortable

20    with it.  He said he would send a letter to HSH to

21    finalize, just so you know, as far as I'm concerned,

22    you're out of this and everything seemed agreeable and

23    fine.  He was paid his $50,000.  I bought $25,000 of

24    inventory and off we went.

25          THE COURT:  What were you going to do in

56

1   particular for -- with the intellectual property that you

2   were securing from AVKO?  I've got to restudy that

3   agreement again but may I understand that you anticipated

4   printing and distributing?

5           MR. MORROW:  We actually went further than that,

6   your Honor.

7           MR. DI GIACOMO:  Your Honor, I can -- I can talk

8   about that.  It was the right to distribute, the right to

9   make derivative works.  It was exclusive rights in the

10  United States and a right of first refusal across the

11  world.  So it was essentially the equivalent of all the

12  copyright rights under Section 106 of the Copyright Act.

13          THE COURT:  Who had drafted that agreement?

14          MR. DI GIACOMO:  Mr. Morrow did, I believe, your

15  Honor.

16          MR. MORROW:  Yes, your Honor.  Don had said that

17  he -- I had offered to have an attorney draft it and he

18  didn't feel comfortable with that.  He wanted a plain

19  English agreement and in my unwisdom, I agreed to that.

20          THE COURT:  Now, do we ever get a signed

21  agreement by Mr. McCabe with W3, with Wave 3?

22          MR. MORROW:  No, your Honor.

23          THE COURT:  But you wrote him a check for

24  $50,000.

25          MR. MORROW:  Correct, your Honor.

57

1          THE COURT:  And presumably recorded that as a

2   capital contribution to Wave 3.

3          MR. MORROW:  Correct, your Honor.

4          THE COURT:  Although it was probably written off

5   a personal account.

6          MR. MORROW:  Correct, your Honor, yes.  Yeah,

7   because Wave 3 didn't actually have a bank account at

8   that time.  I don't even know if it had come into

9   existence quite yet.

10         THE COURT:  Where had it been incorporated?

11         MR. MORROW:  Nevada.

12         THE COURT:  That's an interesting choice.

13         MR. MORROW:  I got Delaware, Florida and Nevada

14   covered now, sir.

15         MR. DI GIACOMO:  I believe it's also registered

16   as a foreign corporation operating within the State of

17   Illinois, your Honor.

18         THE COURT:  All right.  But your client has no

19   signed agreement.  Was there a draft agreement?

20         MR. DI GIACOMO:  There was a signed agreement.

21   You know, I will let Mr. Morrow speak to that but there

22   was a signed agreement on the HSH.

23         MR. MORROW:  Under HSH.

24         MR. DI GIACOMO:  The agreement was drafted but

25   it was signed by Mr. Morrow.  Even though the agreement

58

1    said HSH, the parties were essentially operating under

2    the terms of the original HSH agreement.

3              THE COURT:  That would have been the June 4

4    document.

5              MR. DI GIACOMO:  That's correct.

6              MR. MORROW:  Right.

7              THE COURT:  Was there a later --

8              MR. MORROW:  And subsequent, there were two

9    different drafts of a Wave 3 agreement, one of which

10   spoke to providing shares in Wave 3.  When that was

11   rejected, then there was one that was written with

12   providing a note.

13             MR. DI GIACOMO:  And Mr. McCabe rejected both of

14   those agreements.  He believed that had he accepted a

15   promissory note or had he accepted shares in Wave 3

16   Learning, he would be subjected to some sort of

17   liability.

18             THE COURT:  Miss Woodrow, you sued HSI.

19             MS. WOODROW:  I --

20             THE COURT:  You sued HSI?

21             MS. WOODROW:  I didn't know how the players all

22   were interrelated at that time.  Essentially, HSI no

23   longer exists and HSH is floundering.

24             THE COURT:  I guess my question is, do we have

25   default judgments based on the original June 4 agreement?

59

1          MS. WOODROW:  No.  There is no default judgment

2     against HSH.

3          THE COURT:  Why not?

4          MS. WOODROW:  Or HSI.

5          THE COURT:  Why not?

6          MS. WOODROW:  Because I do not believe the

7     contract was actually between them.  I do not believe it

8     was actually -- that it was authorized by HSH and I have

9     testimony in that regard.

10         MR. DI GIACOMO:  Your Honor, we have proposed a

11    consent judgment.  We have not received any response on

12    that proposal.  We -- from our perspective, we do need to

13    find a way to deal with HSH and HSI because we don't know

14    the status of them and I believe that plaintiff's counsel

15    has been in contact with them.  We have not.

16         THE COURT:  Well, but I guess what I'm getting

17    at is, do you believe that HSH and HSI, are contractually

18    responsible to your client?

19         MS. WOODROW:  No.

20         THE COURT:  Are you simply raising their defense

21    that perhaps that board didn't authorize this transaction

22    and that Mr. Morrow was acting ultra vires?

23         MS. WOODROW:  Yes.

24         THE COURT:  How did you reach that opinion?

25         MS. WOODROW:  Yes, I do.  I think it was

60

1  intended.  He intended it for many months.  I think there

2  is documents that we have that indicate that he was

3  planning this for a long, long time.

4        MR. DI GIACOMO:  Your Honor -- your Honor --

5        MS. WOODROW:  May I -- may I speak, Mr. --

6        MR. DI GIACOMO:  Please.

7        MS. WOODROW:  Thank you, Mr. Di Giacomo.  And

8  he -- counsel has misrepresented the contract, the terms

9  of the contract.  They were not perpetual nor were they

10 worldwide exclusive.  They were only exclusive in the

11 United States and Canada.

12       THE COURT:  We will get to the weeds here.

13       MS. WOODROW:  All right.  So I just want to

14 correct that misrepresentation.

15       MR. DI GIACOMO:  Your Honor, just to speak on

16 the HSI issue -- HSH, excuse me -- there was an

17 authorized resolution from the board of directors of HSH.

18 Mr. Morrow did have the authority to approach AVKO.

19 There is an e-mail chain within the pleadings that we

20 have filed for this hearing basically attesting to that

21 fact.

22       So to the extent that somehow Mr. Morrow usurped

23 corporate profit or somehow took advantage of the

24 corporation of HSH is simply not the case and in fact, we

25 don't have any pleadings at this point alleging that Mr.

61

1   Morrow did that.

2          THE COURT:  Well, then, what is your opinion

3   with respect to HSI and -- I have to get used to the --

4   HSH, legal obligation to Mr. McCabe?

5          MR. DI GIACOMO:  I can't speak as to that.  I

6   don't know.  My opinion, I think --

7          THE COURT:  Your opinion, did your client

8   acquire those rights?

9          MR. DI GIACOMO:  Sure.

10         THE COURT:  How?

11         MR. MORROW:  He resigned from the board of HSH

12   and then proposed the deal to Mr. McCabe and then --

13         THE COURT:  Ended his equity in conjunction with

14   his resignation.

15         MR. DI GIACOMO:  That's correct, yes.  He

16   received, I believe, a payment of $1,000.

17         THE COURT:  And then -- and then he received an

18   assignment of whatever HSI or HSH's interest was in the

19   AVKO agreement.

20         MR. DI GIACOMO:  No.  There was no assignment.

21   There was a release.

22         THE COURT:  Wait.  So they do own it.

23         MR. DI GIACOMO:  I'm sorry?

24         THE COURT:  They do own it.

25         MR. DI GIACOMO:  HSH?

62

1           THE COURT:  Yes.

2           MR. DI GIACOMO:  It is our understanding they

3    do not.  I believe HSH has stated they rescinded the

4    contract.  That's why we don't know what the status

5    of --

6           THE COURT:  Show me -- show me any written

7    document that would suggest a rescission of the agreement

8    between AVKO and HSH or HSI or any document reflecting

9    your client's acquisition of that agreement from them.

10          MR. DI GIACOMO:  Your Honor, I cannot show you

11   that.  I simply do not -- there is no document

12   establishing that.  My --

13          THE COURT:  So it's fair to say that they

14   continue to own all the rights that AVKO granted to them

15   in that intellectual property.

16          MR. DI GIACOMO:  I think that would be fair to

17   say.

18          THE COURT:  And have a continuing legal

19   obligation to Mr. McCabe under that agreement.

20          MR. DI GIACOMO:  Your Honor, I think that would

21   be fair to say but the plaintiff has represented to the

22   Court that HSH does not own the works.  The affidavit of

23   Mr. Nicholson specifically attests to that fact.  He

24   specifically says HSH does not have any rights in the

25   works and does not currently intend to enter into an

63

1   arrangement with AVKO.

2          THE COURT:  Wait.  Is that because your client,

3   Mr. Morrow, was not authorized to enter into that

4   transaction?

5          MR. DI GIACOMO:  I -- you would have to ask Mr.

6   Nicholson.  I don't know what his affidavit is attesting

7   to.

8          THE COURT:  What was your client's opinion about

9   their continuing interest and obligation under that

10  contract when he formed an additional company and entered

11  into negotiations essentially to try to duplicate that

12  transaction?

13         MR. DI GIACOMO:  My client had a conversation, I

14  believe, with Mr. Nicholson internally as well as Mr.

15  Lydecker, explaining to them that he was no longer going

16  to fund HSH.  He intended to resign from the board and he

17  intended to move forward with the deal with Wave 3

18  Learning.  They were well aware of the fact that Mr.

19  Morrow was going to undertake that effort.

20         MR. MORROW:  At that point, your Honor, HSH

21  could not enter into an agreement with Mr. McCabe and

22  AVKO.

23         THE COURT:  It had, though.

24         MR. MORROW:  Pardon?  We had a signed document

25  but the problem was, we needed the second step which was

64

1 a signature on the subscription agreement.  If he doesn't

2 sign the subscription agreement, the securities attorneys

3 will not attach the opinion to the S-1 that allows us to

4 go through registration and the SEC will not recognize

5 that S-1 without the opinion letter and further, FINRA

6 would prevent you from issuing any shares into the public

7 markets if you have any shareholders who have -- who lack

8 a subscription agreement attached to the shares when they

9 were private.

10          THE COURT:  So from your point of view --

11          MR. MORROW:  That deal was dead, your Honor.

12          THE COURT:  Well, we had one document with Mr.

13 McCabe's signature on it but not the complete transaction

14 and the fact that it was an incomplete transaction was in

15 fact, from your point of view, what created the problem

16 with completing the registration.

17          MR. MORROW:  Yes, sir.

18          THE COURT:  The fact that he would not sign the

19 subscription agreement after the other AVKO agreement had

20 in fact been signed.

21          MR. MORROW:  That's correct, your Honor.  The

22 lack of the subscription agreement makes it absolutely

23 impossible for HSH to move forward.

24          MR. DI GIACOMO:  And I believe, your Honor, the

25 subscription agreement was revised twice to -- to attempt

65

1  to resolve Mr. McCabe's concerns with the language.

2        MR. MORROW:  It was revised once.

3        MR. DI GIACOMO:  Once.

4        MR. MORROW:  On the second -- after the first

5  revision which spoke to the use of the verb "purchase,"

6  Mr. McCabe made it very clear that he had no intention of

7  signing the subscription agreement in any form.

8        MR. DI GIACOMO:  Mr. McCabe was worried about

9  some undisclosed liability.  At the time, he had

10 represented he had an attorney advising him but we now

11 believe upon information and belief that he did not have

12 an attorney and that he probably didn't understand what

13 the use of that language within the subscription

14 agreement actually meant, your Honor.

15       THE COURT:  Now, let's go back to Miss Woodrow.

16 I want to get a better understanding.  What -- you've

17 identified Mr. McCabe as a plaintiff in the case.

18       MS. WOODROW:  Yes, your Honor.  Yes, your Honor.

19       THE COURT:  But you've also told me that Mr.

20 McCabe doesn't have any ownership interest in the

21 copyrights.  He's simply an officer of this tax exempt

22 corporation.  How is he hurt?  Why do you have him in as

23 a plaintiff?

24       MS. WOODROW:  Because he was the author and at

25 the time, he -- he is -- I believe -- are you still on

66

1   the board of directors?

2          MR. McCABE:  Yes.

3          MS. WOODROW:  And he is on the board of

4   directors and I was unsure as to when he stopped being

5   the director of AVKO.

6          THE COURT:  Well, but --

7          MS. WOODROW:  And I think he is hurt because I

8   think he was going to be -- I think he was going to be

9   running or managing a lot of the development of the new

10  programs that they wanted to do with AVKO.  But, your

11  Honor --

12         THE COURT:  AVKO --

13         MS. WOODROW:  -- I have the documents to show

14  there was no HSH --

15         THE COURT:  AVKO is --

16         MS. WOODROW:  -- written by Mr. Morrow.

17         THE COURT:  AVKO is the party in interest.

18         MS. WOODROW:  Pardon?

19         THE COURT:  AVKO is the party in interest

20  according to your explanation.

21         MS. WOODROW:  Correct.

22         THE COURT:  What entitlement, if any, would Mr.

23  McCabe have financially from AVKO?  Let's assume for

24  purposes of discussion that rather than --

25         MS. WOODROW:  As an employee?

67

1           THE COURT:  -- a structured payment by HSH of

2   the $600,000, let's assume it was cash.  What was he

3   going to do with the money as an officer and director of

4   AVKO?

5           MS. WOODROW:  Mr. McCabe?

6           MR. McCABE:  One of the things that we would

7   have done almost immediately would be to purchase a camp

8   because there is a camp not too far from --

9           MS. WOODROW:  Headquarters.

10          MR. McCABE:  -- our headquarters, where we would

11  train teachers using students who are dyslexic and show

12  them how to teach.  That's just one of the things.

13          THE COURT:  Why -- why do you have to own a

14  camp --

15          MR. McCABE:  Pardon?

16          THE COURT:  Why do you have to own a camp in

17  order to run a camp?

18          MR. McCABE:  Well, we could have probably

19  rented.

20          THE COURT:  All right.  You've $500,000 left.

21  What are you going to do?  Was your intention to ever

22  recover any of the money that you had invested, your

23  pension funds and your wife's capital investment?

24          MR. McCABE:  I know this sounds rather strange

25  but really, there is only so many cases of beer that I

68

1    can consume. There is only so many rounds of golf. In

2    fact, since I just quit my -- my golf club, I'm perfectly

3    satisfied with my life for whatever I may have left of it

4    and it's not too many -- too many years that I have, not

5    with -- since I've already been informed there is

6    absolutely nothing they can now do for me as far as

7    surgery is concerned. I've had three heart attacks and

8    open heart surgery and all of the tests show that the

9    blockages -- and I even went to Cleveland Clinic. All

10    they can do is treat me with medication. And hope for

11    the best.

12        THE COURT: Now, let's assume for purposes of

13    discussion that we back up the transaction. Wave 3 gets

14    their $50,000 back. I know that there is some additional

15    investment that was made. What are you going to do --

16    what is AVKO going to do? What's their business plan, if

17    you get all this intellectual property back?

18        MR. McCABE: I object to you saying getting

19    intellectual property back because I did not -- or the

20    foundation did not sell any intellectual property.

21    Publishing rights are entirely different than copyrights.

22    Copyrights --

23        MR. DI GIACOMO: Your Honor, I object. This

24    isn't a legal opinion. I know this is an informal

25    hearing but just for the purposes of keeping the facts

69

1   straight --

2           THE COURT:  I understand your point here and I

3   do, and I appreciate that.

4           MS. WOODROW:  Take it as his lay opinion, your

5   Honor.

6           THE COURT:  Right.

7           MR. McCABE:  Okay.  And I -- we can produce

8   documentation in which Mr. Morrow tried to get a contract

9   signed between IMI, AVKO and HSH in which he states that

10  here -- whereas AVKO has the publishing rights -- or

11  excuse me -- AVKO has the copyrights, and HSH has the

12  publishing rights, he himself -- and I think it was in

13  September of '09, that he -- he made the claim, so I

14  think he knows there is a difference and if you check

15  with Google and I have Googled and I have read the

16  copyright law, to copyright something, you have to be the

17  author and he's not the author of these.  Or you can have

18  it for hire and I'm sure he did not pay me one cent for

19  these, for the writing of these, and I'm sure he cannot

20  produce any document that was signed by the AVKO

21  Foundation --

22          THE COURT:  Sir, I --

23          MR. McCABE:  -- saying -- saying, as I did

24  myself to AVKO, I signed a regular transfer of copyrights

25  to AVKO.  AVKO never signed anything assigning the

70

1  copyrights.

2          THE COURT:  Let's put aside the difference of

3  opinion concerning copyrights versus publishing rights.

4  Let's assume that you get back anything and everything,

5  back into AVKO.  What's AVKO going to do with it?  What's

6  your business plan?

7          MR. McCABE:  Oh, well, first of all, since we

8  lost actually three years of development, now, I'm -- I

9  don't know what -- since I'm retired, you would have to

10  ask my -- my son what he's -- who is the current

11  director, and, of course, the president, Barry --

12          MR. ROBERT McCABE:  Chute.

13          MR. McCABE:  -- Barry Chute, what the plan will

14  be.  Because we have lost time, we have lost money and

15  frankly, we don't have $50,000 to give back.

16          THE COURT:  Anybody else need to use the

17  lavatory?

18          MR. DI GIACOMO:  Yes, your Honor.

19          MR. MORROW:  Yes, please, your Honor.

20          THE COURT:  About a five-minute break and we

21  will return, pick it up from this point forward.

22          Thank you.

23          MS. WOODROW:  Thank you, your Honor.

24          THE LAW CLERK:  All rise.  Court is now in

25  recess.

71

1           (At 10:48 a.m.- proceedings recessed)

2           (At 11:04 a.m. - proceedings resumed; all

3           parties present)

4           THE COURT:  I've been dodging a bullet and that

5    is the appropriate pronunciation of your last name.

6           MR. DI GIACOMO:  That's no problem, your Honor.

7    It's Di Giacomo.

8           THE COURT:  Di Giacomo.

9           MR. DI GIACOMO:  That's correct.

10          THE COURT:  You will correct me if I don't do so

11   well going forward.

12          MR. DI GIACOMO:  That's not a problem.

13          THE COURT:  June -- July 20, 2010, Wave 3, by

14   Mr. Morrow, suggests replacing what had been under the

15   earlier, I'm going to say agreement with HSH, which was a

16   promise to furnish a half million dollars worth of HSH

17   stock.  The offer makes the suggestion that you offer

18   $250,000 in the form of a promissory note.

19          MR. DI GIACOMO:  That's correct, your Honor.

20          THE COURT:  It doesn't go anywhere so at this

21   juncture, Mr. Morrow doesn't have anything signed by Mr.

22   McCabe other than a document that he had solicited in the

23   name of HSH.

24          MR. DI GIACOMO:  That's correct, your Honor.

25          THE COURT:  So what does he do next?

72

1          MR. DI GIACOMO:  Your Honor, next, he simply,

2   basically asked Mr. McCabe, you know, what's the status?

3   Mr. Mr. McCabe replied, let's just continue with the

4   status quo, continue selling the works, continue

5   repairing, I believe he said.

6          MR. MORROW:  Get the ISPNs and get the revisions

7   going.

8          MR. DI GIACOMO:  Yes, get the ISPNs and the

9   revisions going.

10          THE COURT:  Could you speak from the microphone,

11   sir?  It would helpful to me because I couldn't hear.

12          MR. MORROW:  I'm sorry, I'm too tall.  He

13   said -- he said get your ISPNs, which are your book

14   registration numbers and get the revisions going and we

15   will maintain the status quo.

16          THE COURT:  What is status quo?

17          MR. MORROW:  At the time, I was the person who

18   was shipping the books.  I was tasked with revising them.

19   I paid him $50,000.  We didn't know what else was going

20   to happen.  That was the status quo.

21          THE COURT:  Well, you tried to get him to agree

22   to the promissory note.  He wasn't agreeable to that.

23          MR. MORROW:  Correct.

24          THE COURT:  At the period -- what was the date

25   of your $50,000 check?

73

1          MR. MORROW:  The 4th, I think, your Honor.

2          THE COURT:  Sounds right.  What are you using

3    for working capital to, quote, "maintain the status quo"?

4          MR. MORROW:  I had gotten additional funds that

5    we used to both purchase the inventory and operate the

6    business with going forward.  In other words, the $50,000

7    wasn't the sum total of all the money I had in the world

8    nor was the additional 25 for inventory.  We had

9    additional funds that we used to get the business

10   started.

11         THE COURT:  And what did you purchase?

12         MR. MORROW:  From Mr. McCabe?

13         THE COURT:  No, in terms of materials.  I'm

14   trying to get an understanding --

15         MR. MORROW:  Oh, originally, I bought a chunk of

16   his existing inventory which if you look at this nice

17   display here, consisted mostly of those pieces in the

18   middle there, you see with the bright covers

19   (indicating).  Those are the Sequential Spellings.

20   Probably something like five or six thousand volumes,

21   total.

22         MR. DI GIACOMO:  What was the total amount of

23   that, was it forty-two thousand?

24         MR. MORROW:  No, twenty-five.

25         MR. DI GIACOMO:  Twenty-five thousand.

74

1          MR. MORROW:  Originally, Don had suggested it

2   would be forty-two but it turned out to be twenty-five

3   because he retained, if I remember from their 990,

4   thirty-eight thousand of inventory themselves.

5          Besides the works, we didn't need to really

6   purchase a whole lot to get started.  The home education

7   market is extremely seasonal, your Honor, and June, July,

8   you're literally falling right into the middle of the

9   season so at that point, there really isn't a whole lot

10  of time to do anything but ship.  We really started the

11  revision activity, development activity, probably like in

12  October once things have calmed down some.

13         THE COURT:  Well, you've paid him $50,000.

14         MR. MORROW:  Yes, your Honor.

15         THE COURT:  You're investing working capital in,

16  was it -- did I get it correct, you've got five thousand

17  to six thousand pieces that you've had printed?

18         MR. MORROW:  Actually, Don had had them printed

19  and he sold them to us out of his inventory.

20         THE COURT:  Don had them printed and then what?

21         MR. MORROW:  And then sold them to us.  That's

22  how we got started was inventory that he had provided.

23         THE COURT:  Okay.  Did you pay him anything

24  other than the $50,000?

25         MR. MORROW:  Yes, I paid him $25,000 for

75

1    inventory, your Honor.

2          MS. WOODROW:  That was at cost, wasn't it?

3          MR. MORROW:  Yes, it was.

4          MS. WOODROW:  Thank you.

5          THE COURT:  And this was beginning in the

6    summer.

7          MR. MORROW:  Yes, your Honor.

8          THE COURT:  Describe for me where you think,

9    what the status quo is.

10         MR. MORROW:  The status quo to me, your Honor,

11   was, I'm tasked to ship and fill orders.  I'm tasked to

12   get the revisions started, to get the new ISPNs because

13   the acquisition of the intellectual property and my

14   opinion, frankly, was that I was going to wait and let

15   Don tell me what he wanted me to do.

16         We offered him two subscription agreements

17   through HSH.  He didn't want those.  I offered him stock

18   in Wave 3.  He didn't want that.  I offered him a note

19   from Wave 3.  He didn't want that.  I have a pretty

20   extensive imagination but that kind of exhausted my

21   imagination for what was to go forward.  So I was willing

22   to wait for Don to tell me what he wanted to do.  I asked

23   him when he turned down the note to have -- for him and

24   his attorney to write an alternative and they -- that

25   never happened.

76

1          So status quo to me was, I'm shipping, I'm
2    moving forward with the revisions.  That's what I'm
3    doing.
4          THE COURT:  Mr. Di --
5          MR. DI GIACOMO:  Di Giacomo, your Honor.
6          THE COURT:  -- why shouldn't we issue the
7    restraining order?
8          MR. DI GIACOMO:  Your Honor, under the new
9    merchant exchange, the test is no longer that irreparable
10   harm is presumed from copyright infringement.  Obviously,
11   there are questions as to copyright infringement here.
12   Whether that copyright infringement is done away with is
13   an open question, obviously one for trial, but the fact
14   that Mr. Morrow keeps accounting records, makes
15   irreparable injury non-existent in this case because
16   there is an adequate remedy at law which is monetary
17   damages and we've always been forthcoming with those
18   records.  We provided sales records to the plaintiffs,
19   both at the joint status conference, and we would be
20   completely willing to continue to provide them.
21          And, you know, quite frankly, as you can see
22   here, there is a lot of open issues.  It's not simply a
23   question of success on the merits but more of a question
24   of how do we split the parties and at this point, it
25   just simply would not be fair to make my client cease

77

1   selling these books which is his only sole form of

2   revenue without the actual determination of the facts at

3   issue.

4           THE COURT:  Why do you think the distinction

5   between -- that the plaintiff is attempting to draw

6   between publishing rights and ownership -- copyright

7   ownership rights is important?

8           MR. DI GIACOMO:  I don't think there is a

9   distinction between publishing rights and copyright

10  rights.  Copyright is the only right in a work of

11  intellectual property like a book.

12          The question that I believe the plaintiff is

13  getting at is, is this is a non-exclusive license or is

14  this an assignment of copyright rights and under any

15  scenario, there are still a lot of issues that need to be

16  resolved that don't present the plaintiff with a

17  likelihood of success on the merits, number one being, if

18  we're going to split the parties, my client has invested

19  a lot of time and money based on the representations of

20  the plaintiff and, you know, how does he get that money

21  back?

22          I think those types of issues lend towards a

23  ruling, the necessary result of a ruling that a

24  preliminary injunction should not issue at this stage

25  because there is simply no likelihood of success on the

78

1   merits based on all of these remaining issues.  And I
2   think that, at the very least, there was an oral
3   non-exclusive license which is permissible under the
4   Copyright Act which would act as a complete defense to
5   any claims of copyright infringement.
6           THE COURT:  What's the nature of your cause of
7   action in the counterclaim?
8           MR. DI GIACOMO:  The nature of the cause of
9   action is -- it's been a long time, I'm sorry, your
10  Honor -- I believe we had a breach of contract claim
11  which we removed for promissory estoppel because at the
12  status conference, we discussed extensively that there
13  wasn't a contract between Mr. Morrow and AVKO and in
14  fact, it was probably more of a reliance relationship.
15  So all of our causes of action are based around reliance
16  damages.
17          THE COURT:  We still have this unresolved issue
18  with respect to HSI and HSH, the -- do we have any reason
19  to believe that they have any legal interest in the
20  contract that your client signed or any obligation to the
21  plaintiff?  And I assume your answer is probably I don't
22  know.
23          MR. DI GIACOMO:  It -- it is in a way but I
24  don't believe -- I believe that HSH has completely
25  disclaimed any rights to the works under the original

79

1    agreement.  I believe both the plaintiff and HSH have --

2    have made representations to the effect that neither

3    party believes that a contract existed to the extent that

4    the plaintiff has probably waived any claims against HSH.

5    I don't know.  I would like to see a consent judgment

6    just clarifying that relationship.  Again, I don't have

7    contact with HSH so I'm not really sure how that would

8    work out.

9         THE COURT:  Including any right they might have

10   to indemnity by your client as a result of what the

11   plaintiff would allege was ultra vires activity.

12        MR. DI GIACOMO:  That possibly could be but the

13   plaintiff has not alleged that at this point.  I'm not

14   quite sure what the plaintiff is alleging with regard to

15   HSH which has been my concern all along.  I think that

16   the allegation is expanding in scope without the proper

17   pleadings laying the ground work.

18        We've requested a consent judgment or something

19   along those lines so we could at least affirmatively

20   respond in pleading form or motion form to those types of

21   allegations but they are just simply not in the record at

22   this point.

23        THE COURT:  How do we -- how do we wrap up and

24   how do we conclude what your point of view is with

25   respect to these parties, Miss Woodrow?

80

1          MS. WOODROW:  It is my contention that Mr.

2     Morrow intended from the very -- from the very beginning

3     or at least in January of 2010, to take over this

4     contract and to take over this deal because he was hoping

5     that after having a series -- he's a serial entrepreneur.

6     Well, he's serial failed entrepreneur.  Every -- every

7     start-up he has had has voluntarily dissolved or just

8     failed miserably and this is just another one in a

9     series.  He represented, I have documents --

10         THE COURT:  I'm sure you made him feel very good

11    about himself but --

12         MS. WOODROW:  I'm sorry, sorry, sir, but it's

13    just --

14         THE COURT:  -- that does not ultimately answer

15    my question.

16         MS. WOODROW:  Okay.

17         THE COURT:  You've had this lawsuit pending

18    against a party who had executed the agreement, mainly

19    Mr. Morrow, on behalf of these two other entities.

20         MS. WOODROW:  Right, but he signed it

21    fraudulently.

22         THE COURT:  Does your client maintain a

23    legitimate contract right against those parties?

24         MS. WOODROW:  I do not believe so, between HSH,

25    after having discovered --

81

```
 1          THE COURT:  Do you --
 2          MS. WOODROW:  -- HSI was absorbed by HSH so HSI
 3   does not exist.  I did not know that at this time, when I
 4   filed the -- when I filed the pleading.  I do now.
 5          THE COURT:  And --
 6          MS. WOODROW:  And therefore, I -- I can dismiss
 7   them.  They haven't appeared so they really are
 8   non-entities.  I can do a dismissal as to HSI.
 9          THE COURT:  Well --
10          MS. WOODROW:  And I can do it --
11          THE COURT:  -- why would you dismiss a lawsuit
12   against the only entity that has an executed contract?
13          MS. WOODROW:  HSI does not.
14          THE COURT:  HSH does.
15          MS. WOODROW:  HSH does.
16          THE COURT:  And HSI is its successor.
17          MS. WOODROW:  If they will remit over to us a
18   cause of action for misappropriation, perhaps, by their
19   officer and a violation of his code of ethics, but Mr.
20   Morrow represented to my client that he was coming to do
21   this as an individual --
22          THE COURT:  Well, wait a minute.
23          MS. WOODROW:  -- the day before the execution.
24          THE COURT:  You just elected -- you just elected
25   to characterize the transaction that Mr. Morrow conducted
```

82

1    as an unauthorized transaction.

2              MS. WOODROW:  I believe it was.

3              THE COURT:  Why are you telling me that rather

4    than them telling me that?  You represent this gentleman.

5    Why wouldn't you sue them and either, A, take a default

6    judgment or if they are willing to so characterize that

7    transaction that way, maybe they will -- they will assign

8    you the cause of action, I don't know, but we do not know

9    what their characterization of that contract is or of Mr.

10   Morrow's conduct.  We don't know that.

11             And the case has been pending how long?

12             MR. DI GIACOMO:  Seven months, your Honor.

13             MS. WOODROW:  I will rely on -- July, August,

14   probably, six, seven -- six months.

15             THE COURT:  Now, let's back up.  June 4 comes

16   around.  Mr. McCabe does not want to sign the

17   subscription agreement.  Which Mr. Morrow would suggest

18   was both required and necessary for him to complete the

19   registration statement.

20             MS. WOODROW:  He is not told that and I don't

21   believe that that -- I don't believe that that is

22   accurate.

23             MR. DI GIACOMO:  Your Honor --

24             MS. WOODROW:  Just --

25             THE COURT:  Pardon me?

83

1          MS. WOODROW:  I don't believe that that is

2     accurate, your Honor.

3          MR. DI GIACOMO:  I just want to say, we have

4     e-mail evidence establishing -- we have e-mail evidence

5     establishing the fact that he was told that.

6          MS. WOODROW:  I didn't understand what you --

7          MR. DI GIACOMO:  He was told that the

8     subscription agreement was necessary to complete the IPO.

9     He was told that in an e-mail.

10         MS. WOODROW:  I -- I didn't understand what you

11    said.

12         THE COURT:  He was told expressly that the

13    execution of the subscription agreement was both required

14    as a result of the written agreement he had already

15    signed and necessary to the completion of the transaction

16    leading to the --

17         MS. WOODROW:  I would like to see his

18    verification of that, your Honor, because he had already

19    filed an *HK in January with the SEC with a document, with

20    a signature by Mr. McCabe, and a false note.  So he had

21    already filed something with the SEC on January 5th of

22    2010.

23         I wish we had been allowed to have me call him

24    as a witness and go through some cross-examination where

25    he's under oath because he's made several

84

1  misrepresentations and lies here and there are others.

2        THE COURT:  All right.  And I appreciate that.

3        MS. WOODROW:  Thank you, your Honor.

4        THE COURT:  I've actually conducted this hearing

5  in this fashion for a reason.

6        MS. WOODROW:  I understand, okay.  Thank you,

7  your Honor.  I'm sure you did and I'm not questioning

8  your wisdom, I'm just, you know --

9        THE COURT:  This is going to be kind of like an

10  extended opening statement where we've got the

11  participation of the parties --

12        MS. WOODROW:  Okay.

13        THE COURT:  -- without the disadvantage of

14  anyone being under oath with the associated penalties.

15        MS. WOODROW:  I've -- I've been in contact with

16  HSH, with the -- the interim CEO, Mr. David Nicholson,

17  who is here, who has told me that they withdrew their

18  authorization prior to entering into the contract.  Mr.

19  Morrow sent an e-mail saying he was going to enter into

20  the contract as an individual.  Nevertheless, he signed

21  it on behalf of HSH and I'm sure that once we leave here,

22  there will be a -- some sort of an agreement between Mr.

23  Nicholson and between AVKO -- between HSH and AVKO as to

24  the assignment of any claims that might exist from HSH

25  over to Mr. Morrow.  That can be -- that will be done

85

1   within 30 days.

2           THE COURT:  Okay.  Now, let's talk about what

3   happens after June 4.

4           MS. WOODROW:  Yes.  After --

5           THE COURT:  Apparently, to use the language that

6   Mr. Morrow said, when he had exhausted his efforts at

7   getting the subscription agreement or promissory note

8   signed --

9           MS. WOODROW:  The subscription agreement

10  required -- required Mr. McCabe to pay for the stock,

11  number one.  Number two, it required him to make

12  representations that were not appropriate in the

13  subscription agreement that he could afford to lose

14  money, et cetera, et cetera, and that he was a certain

15  type of a corporation or certain type of entity, that

16  he could not make those representations on behalf of

17  AVKO.

18          THE COURT:  Okay.

19          MS. WOODROW:  He couldn't sign it.

20          THE COURT:  All right.

21          MS. WOODROW:  He read the subscription

22  agreement.  He couldn't sign it either with or without

23  the requirement to pay money.  When he is selling the

24  company --

25          THE COURT:  He is, however, on the other hand,

86

1    quite willing to accept a check for $50,000 and to accept

2    a check for $25,000 worth of inventory.

3            MS. WOODROW:  Correct.  Because --

4            THE COURT:  With what contemplated obligation?

5    He has all the money.

6            MS. WOODROW:  He doesn't have all the money.

7            THE COURT:  He has the fifty thousand and he has

8    the twenty-five thousand.

9            MS. WOODROW:  But he doesn't have the shares.

10   He is expecting the IPO to go through and when the IPO

11   goes through, then he is expected to be given -- AVKO is

12   expected to be given $250,000 worth of shares, they will

13   turn right around and sell --

14           THE COURT:  Wave 3 was going to go through the

15   IPO?

16           MS. WOODROW:  No, it was with -- he believed it

17   was HSH.  He was apparently --

18           THE COURT:  Well, it's quite clear, he is told

19   at that point that Mr. Morrow is out of HSH and HSI.

20           MS. WOODROW:  That's -- HSH.

21           THE COURT:  That he is organizing Wave 3, he

22   wants to go forward with his best efforts to complete the

23   transaction with that template.

24           MS. WOODROW:  No, he does not complete a

25   transaction with Wave 3.  Never.

87

1          THE COURT:  He wants -- he is told by Mr. Morrow

2    that he would like to complete the transaction using that

3    as a basic template.

4          MS. WOODROW:  As far as Mr. -- as far as AVKO is

5    concerned, AVKO has already performed.  They gave all

6    the -- they gave them everything.  They performed fully

7    on June 4th, when they gave them the inventory and when

8    they gave them all of the disks and all of the --

9    everything that they could publish, what they could use

10   to publish, they performed a hundred percent.  Their

11   performance was done on June 4th and picking up the

12   materials within the next week or so.  Their performance

13   has never been completed.  Never.

14         THE COURT:  Well, and what was it that they were

15   to do?

16         MS. WOODROW:  They were to -- he was to supply

17   two hundred -- shares worth $250,000 when it became an

18   IPO.  He registered -- he --

19         THE COURT:  No, no, no.  No.  That was the

20   earlier arrangement with HSH.

21         MS. WOODROW:  There was no subsequent

22   arrangement.  There was no consideration for the

23   subsequent arrangement with the Wave 3 Learning.  AVKO

24   doesn't care whether they -- what name they publish it

25   under.  They can publish it under Don Jones, *Davy Jones'

88

1    Locker.  It doesn't matter what name they publish it

2    under.

3            As far as he knew, Mr. Morrow and/or HSH, he

4    didn't know but somebody was going to publish them.  He

5    doesn't -- he didn't know what name or what they were

6    going to do.  They were just going to publish them.  It's

7    a ministerial task, like a secretary taking shorthand.

8            THE COURT:  All right.

9            MS. WOODROW:  It doesn't matter if she uses a

10   blue book or a red book as long as she is taking

11   shorthand.

12           THE COURT:  But you've lost me again.  Was the

13   HSH and HSI transaction done and finished?

14           MS. WOODROW:  From his perspective, he fully

15   performed on June 4th.  There was nothing for him to do

16   with Wave 3 Learning.  Wave 3 Learning is irrelevant to

17   him.

18           MR. McCABE:  It did not exist.

19           MS. WOODROW:  It didn't exist on June 4th.

20   Well, it did but nobody knew about it, only Mr. Morrow.

21   He got a website for it in January while he was working

22   for Home School.  While he was a CEO for HSH, he went out

23   and got a website for Wave 3 Learning under HSH.  Then he

24   took that website with him and formed the Wave 3 Learning

25   once he had his hot little hands on his disks and his

89

1    materials of AVKO so that he could then begin to publish.

2          And AVKO turned everything over to them,

3    everything.  There was nothing more for them to do to

4    perform.  They had performed -- the contract was done as

5    far as they were concerned.

6          All that had to be done to complete the

7    performance of the contract was for Morrow to supply the

8    $250,000 worth of shares once it became an IPO and it was

9    going to become an IPO -- he had a hundred forty-three

10   million shares so if it comes up at a penny per, he is

11   going to be able -- or half a cent per and they were

12   still trying to get three hundred -- they started out

13   trying to get fourteen million in the IPO, then it went

14   to four point four million, then it went to three point

15   three million and I don't know where the IPO is.

16         But it doesn't matter because he repudiated the

17   contract when he sold his shares back to HSH.  He could

18   no longer perform.  And he entered into the contract as

19   an individual.  He repudiated it because he sold his

20   shares that he could have given him if it ever went on to

21   be an IPO.  If HSH continued and became an IPO, Morrow

22   who was publishing would not have had the shares to pay

23   him.  That's a repudiation by conduct.

24         THE COURT:  Okay.

25         MS. WOODROW:  And therefore, he repudiated the

90

1  contract and he tried to replace it with another schmuck

2  contract where he is going to get one-eighth of nothing.

3          THE COURT:  Now, slow down, slow down.

4          MS. WOODROW:  Yes, sir.

5          THE COURT:  That's all right.

6          MS. WOODROW:  Thank you.

7          THE COURT:  What is your client owed by Wave 3?

8          MS. WOODROW:  By Wave 3?  Essentially, nothing.

9  He is owed by Morrow.  Whoever -- whoever --

10          THE COURT:  No, no, no, talk to your client.

11          MS. WOODROW:  Okay.

12          MR. McCABE:  Wave 3?  We lost sales because we

13  allowed them to publish and when they decided -- or Tom

14  decided that -- that the onesie twosie, to quote him,

15  sales were not worth his time, this is where we made our

16  $291,000 the year before, that he is quoting on, mostly,

17  from onesie twosies, from individual home schoolers.

18          What he has done or didn't do, was to really

19  market the materials.  The fact that he only made

20  whatever it was he says he made was his fault because he

21  was a very poor publisher.  I thought he was an

22  entrepreneur.  I thought he could do things because he

23  did a great job of selling himself to me and, of course,

24  to others that we can, of course, bring up to testify.

25          THE COURT:  Now, here is my question.  Does --

91

```
 1  are you pursuing Mr. Morrow and Wave 3 for breach of
 2  contract?
 3           MR. McCABE:  Yes.
 4           MS. WOODROW:  There is no contract with Wave 3.
 5  There is a contract with Morrow or Morrow doing business
 6  as HSH.
 7           THE COURT:  All right.  If there is no contract
 8  with Wave 3 --
 9           MS. WOODROW:  There is nothing written with Wave
10  3.
11           THE COURT:  Okay.
12           MS. WOODROW:  There is no consideration.
13           THE COURT:  All right.  So we dismiss them.
14           MS. WOODROW:  And the bottom line is, any monies
15  that he spent, he had to have anticipated spending money
16  to publish.
17           THE COURT:  We can dismiss Wave 3.
18           MS. WOODROW:  I don't care if -- it doesn't
19  matter -- he may have chosen that vehicle.  That was his
20  choice to choose that vehicle to do the publishing, okay?
21  He could have decided to do it in the basement.  He could
22  have decided to hire a company to do it.  He could have
23  published it on an Epson.  He could have hired a printer.
24  It doesn't matter.  That was his bailiwick of how he was
25  going to publish, was his business, and whether he chose
```

92

1   to do it through Wave 3 or whatever, we don't know.

2          We're just not sure -- he misrepresented that it

3   was an HSH contract.  It was a confusion.  It was a

4   structured confusion as many of his comments are

5   structured confusion.  If you read his LinkedIn, you read

6   his resume, you read a lot of things, he says things that

7   are not quite so.  He says that People's Energy sought

8   him out.  They didn't.  He walked into -- he went into a

9   different interview and walked into that interview by

10  mistake and they hired him.  That's what he says in a

11  document.  So he misrepresents and he structures things

12  and he says things to make people do what he wants them

13  to do.  He never once alerted Mr. McCabe that there was

14  a -- at that time, a six million dollar deficit of HSH

15  before he signed that contract.

16          THE COURT:  Well, but, I'm -- what I'm getting

17  at here --

18          MS. WOODROW:  Yes.

19          THE COURT:  -- is you already told me that you

20  don't have a contract with HSH or HSI or if you do, you

21  haven't elected to pursue it.  You've told me that.

22          MS. WOODROW:  I believe that --

23          THE COURT:  You've told me --

24          MS. WOODROW:  -- it was signed that way but I

25  think it was a fraudulent signature.

93

1          THE COURT:  You've told me --

2          MS. WOODROW:  Yes.

3          THE COURT:  -- that you don't have a cause of

4  action against Wave 3 at least for a breach of an express

5  written contract.

6          MS. WOODROW:  Correct.

7          THE COURT:  So you do have a cause of action

8  against Mr. Morrow for breach of contract for failing to

9  pay $550,000.

10          MS. WOODROW:  Actually, six hundred.  It would

11  have been two payments of $300,000, which he contemplated

12  and he verified in an e-mail, that it would be two

13  $300,000 payments.

14          THE COURT:  Well, he has paid fifty.

15          MS. WOODROW:  Pardon?

16          THE COURT:  He paid fifty.

17          MS. WOODROW:  He paid fifty but there is still

18  some due and owing and by -- by voluntarily --

19          THE COURT:  If -- if that is the case, you're

20  entitled to your $550,000 in the form of a judgment and

21  he is entitled to continue to pursue the development of

22  the works.

23          MS. WOODROW:  If we sue for specific

24  performance.  However, by his repudiating the contract,

25  we are accepting his repudiation of the contract.

94

1          THE COURT:  Okay.  So --

2          MS. WOODROW:  And we have damages and we have

3    lost profits.

4          THE COURT:  -- rescission.  Are you telling me

5    that I disregard the allegation of a contract and breach

6    of contract?

7          MS. WOODROW:  I'm trying to plead in the

8    alternative.

9          THE COURT:  Well, no.

10          MS. WOODROW:  Oh.

11          THE COURT:  You can plead in the alternative but

12    at some juncture, you have to decide.

13          MS. WOODROW:  Yes, your Honor.

14          THE COURT:  They are -- they are inconsistent

15    remedies.

16          MS. WOODROW:  Yes, they are, your Honor.

17          THE COURT:  You are either enforcing a contract

18    or you're unwinding a contract that never either existed

19    or should have existed.

20          And whenever we talk about the concept of

21    rescission, we have to talk about restitution.

22          MS. WOODROW:  How about lost damages?

23          THE COURT:  Well, wait a minute.

24          MS. WOODROW:  Damages that were caused by --

25          THE COURT:  You told me --

95

1          MS. WOODROW:  -- repudiation of the contract.

2          THE COURT:  You told me there was no contract.

3          MS. WOODROW:  I think we have a contract that's

4    been breached and the breach has caused damages to my

5    client.

6          THE COURT:  No, you just told me there was no

7    contract.

8          MS. WOODROW:  Between -- I think Morrow entered

9    into a contract with them.

10         THE COURT:  Well, then --

11         MS. WOODROW:  Maybe a little --

12         THE COURT:  Then you are ultimately entitled to

13   a money judgment.

14         MS. WOODROW:  All right.

15         THE COURT:  Right?

16         MS. WOODROW:  Yes, your Honor.

17         THE COURT:  And you will get your money judgment

18   for $550,000 plus but he gets to keep and continue to

19   develop the works.  The breach of contract has been

20   remedied by your judgment against him for the $550,000

21   but that doesn't mean that you get the money and the

22   works.

23         MR. McCABE:  Under the provision that he drop

24   the claim to copyrights.

25         THE COURT:  Well --

96

1          MS. WOODROW:  And stops putting copyrights on
2    the materials.
3          THE COURT:  -- we have to do one of two things.
4    There is only two things that I'm authorized to do.  One
5    is to unwind the transaction because it never existed
6    or -- in which case, you give him back anything he gave
7    you and he gives back anything he thinks you gave him.
8          MS. WOODROW:  Is he not required to give back,
9    also, the fruit of whatever he was given?
10         THE COURT:  We will talk about that but I want
11   to -- I want to get through the idea that we can't do two
12   things.
13         MS. WOODROW:  Right.
14         THE COURT:  If there is a contract with Mr.
15   Morrow/Wave 3, then you're not entitled to a restraining
16   order because what you're entitled to is a judgment for
17   $550,000 and he gets to keep the works.
18         MS. WOODROW:  The right to publish.
19         THE COURT:  We can talk about that distinction
20   later but let's -- let's make sure that we get an
21   understanding for what the ground looks like from twenty
22   thousand feet before we look at it from five.  My point
23   being that if you have a legitimate cause of action
24   against Mr. Morrow and Wave 3, that he gets to keep
25   whatever he bought and he's obligated to pay $550,000.

97

1          MS. WOODROW:  Additional.

2          THE COURT:  That's what --

3          MS. WOODROW:  Above and beyond the $50,000

4    that's already been paid.

5          THE COURT:  Yes.  Now, you can elect that

6    remedy.  You can elect that remedy.

7          The other remedy you can say is, oh, Ludington,

8    there was never any agreement.  What we need to do is

9    unwind this transaction.  Now, I fully acknowledge that

10   my client needs to tender back anything that they

11   received as equivalently as Mr. Morrow has to tender back

12   what he got.

13         MS. WOODROW:  Plus the profit from the use of

14   that.

15         THE COURT:  Now, he's, I'm sure, gotten filthy

16   rich in the last two to three years on whatever he has

17   done with that product.  Now, Mr. McCabe is going to tell

18   you that in that time period, they lost someplace between

19   one hundred and three hundred thousand on what he could

20   have done with Brian on the onesies twosies.  He

21   considers that a lost.

22         Well, just out of curiosity, how have things

23   gone with respect to whatever you've been able to

24   accomplish since June of 2010 through today's date with

25   the quote "Continuation of the status quo"?

98

1        MR. DI GIACOMO:  Your Honor, I want to address

2   two points.  One is Mr. Morrow's sales which he can

3   attest to himself but also the fact that AVKO has been

4   selling at the same time which slightly diminishes the

5   market for the works and also is in violation of the

6   contract if there is in fact a contract.  If that's the

7   position that the plaintiff wants to take, then that

8   would be a violation of the contract because the contract

9   actually states that AVKO can only sell the works to

10  maintain their membership status as a 501c3 but I will

11  let Mr. Morrow attest to the sales as to date.

12        MR. MORROW:  Your Honor, in the year 2010, we

13  had $92,000 in sales.  I do calendar years, not fiscal

14  years like Don does.  In the year 2011, we had $128,000

15  in sales.  To date in January, we've had about $5,200

16  more in sales.

17        MR. DI GIACOMO:  And Mr. Morrow, can you also

18  explain what you've done to advertise the works because I

19  believe that that's also at issue.  AVKO's position,

20  obviously, is that Mr. Morrow has not made these sales

21  because he failed to advertise so can you shed some light

22  on what you have done?

23        MR. MORROW:  We have spent approximately $17,000

24  attending these home school shows.  The shows that we

25  attended had a grand total attendance of about seventy

99

1   thousand.  These are typically recognized as the best way

2   to reach home educators because opinion makers go to

3   these shows.

4           MS. WOODROW:  I'm having trouble hearing you.

5           MR. MORROW:  I'm sorry.  I will just hold this.

6   That would be easier.  Thank you.

7           We attended eight shows, your Honor, that were

8   attended by a grand total of seventy thousand home

9   educators.  In the course of these shows, typically you

10  get a chance to present directly to users, most valuable

11  users who are opinion makers who go home and tell their

12  friends and their co-ops and their organizations what it

13  is they found.  We found that extremely successful.

14          Getting to actually talk face-to-face, I would

15  guess with something like twenty thousand current and

16  potential users was much more effective than spending the

17  same amount of money buying online ads on websites

18  because it actually allows people to touch and feel the

19  product.  As you can see, it's very effective here.

20          MR. DI GIACOMO:  Mr. Morrow, you bought ads on

21  websites, is that correct?

22          MR. MORROW:  I did not, no.

23          MS. WOODROW:  Pardon?

24          MR. MORROW:  No, I did not.  No, it -- I have a

25  great deal of experience in the online world, your Honor,

1   and in my experience, purchasing online ads is --

2           THE COURT:  A waste of money.

3           MR. MORROW:  -- worse than useless.

4           THE COURT:  Okay.

5           MR. MORROW:  It's similar to Mr. McCabe's point

6   about the onesies twosies.  He does wonderful things with

7   onesies twosies.  I actually sat there and figured -- I

8   ran through his financials once and I guess he loses

9   about $20 for every onesie twosie he fills on a

10  fully-loaded basis.  This is me coming out as a cost

11  accountant.  I don't sell against my distributors which

12  is why I don't do onesies twosies and the distributors

13  are very happy about that.

14          MR. DI GIACOMO:  Can you also speak to other --

15          THE COURT:  We need to back up a little bit

16  here.

17          MR. MORROW:  Yes, sir.

18          THE COURT:  Because I'm still trying to

19  understand the characterization of both Mr. McCabe's

20  cause of action, trying to figure out whether he is

21  suggesting there was a contract that was breached and

22  he's entitled to what he would have earned had the

23  contract been performed or alternatively, there was a

24  good effort at a contract, a mutual mistake of fact,

25  possibly, and as a result, we need to unwind the

1   transaction.

2         MR. DI GIACOMO:  Your Honor, pursuant to our

3   status conference in October, we took the position that

4   there was no contract and that the only appropriate

5   remedy would be to split the parties and the reason we

6   did that is because at the time the plaintiffs

7   represented that that's what they wanted, that Robert

8   McCabe was going to move forward with running AVKO and

9   that they wanted to have nothing to do with our client.

10  That's been our consistent position since then.

11        The confusion that you're seeing is the same

12  confusion that we have and that is what do the plaintiffs

13  want.  We do not know so, you know, we can't -- we can

14  respond to things that are within the pleadings but until

15  we get a consistent picture of what exactly they want to

16  do, we can't answer that question.

17        MR. MORROW:  And we have made an offer of

18  judgment that's consistent with the position that we have

19  taken.

20        MR. DI GIACOMO:  Which will be filed with the

21  Court, your Honor.

22        THE COURT:  But it can't be -- you can only file

23  notice.

24        MR. DI GIACOMO:  We -- we've given notice.  The

25  14 days will be up tomorrow.

102

1          THE COURT:  But my point is that it's important
2    that you not tell me what's in that offer.
3          MR. DI GIACOMO:  I'm sorry.  Mr. Morrow --
4          MR. MORROW:  I beg your pardon, your Honor.
5          THE COURT:  The fact that you have done it is
6    something that I may know.  The amount is something I may
7    not.
8          MR. DI GIACOMO:  And we will not speak to it.
9          THE COURT:  The rule is written to the extent
10   that I remain a finder of the fact in the context of the
11   case, is I'm -- I'm to be left out of that discussion.
12         MR. DI GIACOMO:  Understood, your Honor.
13         THE COURT:  Now, to be sure, I've seen that set
14   of circumstances occur.  I've got a couple of cases
15   sitting on my desk where there were very, very severe
16   penalties as a result of refusals of offers of judgment.
17         I've got one case right now still spending where
18   we're writing opinions where a party refused an offer of
19   judgment for $18,000.  Case went to trial, spent five
20   days with it.  There were attorney fees in excess of
21   $98,000.  The opposing party became responsible because
22   they did not improve their position at trial and the
23   question that we have in the context of that case,
24   because the party that refused had to enter a Chapter 13
25   bankruptcy proceeding, is whether or not we can continue

1  to make a decision as to whether or not the -- I won't

2  involve you with the details of it because it's slightly

3  irrelevant.

4          The point nevertheless being in the context of

5  that circumstance, the refusal of the offer of judgment

6  was sufficiently significant to require that party to

7  seek chapter relief.  They couldn't afford to pay the

8  bill that was associated with continuing the dispute.

9          MS. WOODROW:  We submitted an offer of judgment

10  that they have refused, correct?

11          MR. DI GIACOMO:  Your Honor, it was filed with

12  the Court.  I mean, I'm sure that you know the history.

13  I believe that we refused it because we haven't answered

14  it but it was filed with the Court prematurely.  We were

15  not provided with much notice.  It was not within the 14

16  days.

17          MS. WOODROW:  I'm -- I'm sorry?

18          THE COURT:  Now, let's -- let's back up here for

19  just a moment.

20          MS. WOODROW:  Did you -- did you reject the

21  offer?

22          MR. DI GIACOMO:  I don't know what the time

23  period is.  I believe we rejected it because we did not

24  respond to it.

25          MS. WOODROW:  I think you sent me an e-mail

104

1   rejecting it.

2           MR. DI GIACOMO:  We -- we did but there was

3   some clarification needed as to whether or not you were

4   in a position to make the offer because you were not at

5   the time a defendant which is what's required under the

6   rule but in the alternative, if you are considered

7   currently a defendant, then we did reject the offer.

8   That's correct.

9           MS. WOODROW:  Okay.

10          THE COURT:  Following -- well, let's back up.

11  I have one area of fact where I'm still not clear of what

12  the allegations are.

13          Mr. McCabe, Mr. Morrow, says that after your

14  effort to secure the subscription agreement from him, you

15  never told him anything about Wave 3.  He never told you,

16  gosh, I understand -- I don't know exactly what to do,

17  let's continue the status quo.  That's what you told me

18  but that's not what he says.  What did he say?  And when

19  did he say it?

20          MR. MORROW:  At the time I spoke to him, he said

21  he was comfortable with that solution, that he would

22  write a letter to HSH telling them that they were -- as

23  far as he was concerned, that they were out of the deal.

24  When they filed their 990 that October, he recognizes

25  that he has a deal with Wave 3 Learning.

1    So if he didn't have a deal with Wave 3

2 Learning, why did he tell the IRS that he did, I guess

3 would be my question.

4    MR. DI GIACOMO:  And, your Honor, he was also

5 again presented with an agreement with Wave 3 Learning in

6 that agreement.  That was the point at which Mr. Morrow

7 offered him a promissory note in exchange for -- or in

8 substitution, excuse me, for the $250,000.  That

9 agreement was titled Wave 3 Learning.

10    THE COURT:  Is that true, Miss Woodrow?

11    MS. WOODROW:  I'm sorry, I didn't --

12    THE COURT:  Is that true?

13    MS. WOODROW:  I didn't understand him.

14    MR. McCABE:  I didn't see any promissory note

15 offered to me.

16    THE COURT:  Can you explain it one more time,

17 Mr. Morrow, so Miss Woodrow can hear it?

18    MR. MORROW:  Yes.  When Don turned down the Wave

19 3 Learning alternative agreement that said $250,000 worth

20 of shares, I offered the alternative suggestion that we

21 convert the agreement into one that used a promissory

22 note instead, in the same amount -- in the same dollar

23 amount.  At that time, he gave -- said, don't talk to me

24 until you can give me an agreement I can sign.  Let's go

25 forward with the status quo.  Go out and get your ISPNs

1   and begin to get the revisions.

2          MS. WOODROW:  I believe that's somewhat

3   accurate.  I'm going to just check the e-mail.  I've got

4   the e-mail right here.

5          THE COURT:  So we do have a contract with Wave

6   3.

7          MS. WOODROW:  Well, I don't -- maintaining the

8   status quo, doesn't mean that -- maintaining the status

9   quo means go ahead and do whatever you're going to do.

10          THE COURT:  What does that mean?

11          MS. WOODROW:  There was no -- the status quo

12   would have been no agreement or whatever they were

13   working on that was signed on June 4th.  I believe that

14   he believed that they were operating under the June 4th,

15   2010 agreement and so did Mr. Morrow.  He's referred to

16   it in multiple e-mails throughout the year as referring

17   to that's the agreement, the June 4th, 2010 agreement.

18          THE COURT:  Why would he reject the promissory

19   note if that was true?

20          MS. WOODROW:  Pardon?

21          THE COURT:  Why would he reject the promissory

22   note if that was true?

23          MS. WOODROW:  Because he can't pay.  There is no

24   proof that he can pay.  He believed that -- did you not

25   believe that HSH was going to go public and you would get

1  stock?

2         MR. McCABE:  On June 4th, yes --

3         MS. WOODROW:  Did you believe it in July?

4         MR. McCABE:  -- and prior to that.

5         MS. WOODROW:  Did you believe it in July when --

6  did you ever have a reason to disbelieve that HSH was

7  not?  Did you -- did you know that Tom Morrow gave up his

8  stock to HSH?

9         MR. McCABE:  Ah --

10        MS. WOODROW:  Until recently?

11        MR. McCABE:  Not until quite -- quite a while

12 after all of these events, when we began to look.

13        MS. WOODROW:  When?

14        MR. McCABE:  I'm not sure what date.

15        MS. WOODROW:  Did you -- when did you know that

16 HSH was not going to have an IPO?  Did you ever know that

17 until recently, until after we started the lawsuit?

18        MR. McCABE:  Well, just before we started the

19 lawsuit.

20        MS. WOODROW:  Is that when you found out that

21 HSH had retreated from their request for the IPO?  So as

22 far as you knew, the IPO was always a possibility.

23        MR. McCABE:  Yes.

24        THE COURT:  That doesn't make sense.

25        MR. DI GIACOMO:  Your Honor, I believe that Mr.

1  McCabe's response to the promissory note was that he was

2  worried he was going to become liable for debt of Wave 3

3  Learning.  I believe the response e-mail specifically

4  states that.

5           THE COURT:  What's important is there is a point

6  at which -- someplace late in June or early July where

7  Mr. Morrow has to go back to him, he has Wave 3

8  organized.  He has a promissory note that he wants him to

9  accept as his next shot at figuring out how the

10  transaction goes forward and he asks Mr. McCabe, how

11  about the promissory note?  It's -- the other transaction

12  isn't going to work.  I've left, I'm gone, right?

13           MR. MORROW:  Correct, sir.

14           THE COURT:  And what's he say?

15           MR. MORROW:  He said he doesn't want an

16  agreement that he can't sign.  He doesn't want to become

17  liable for the debts of Wave 3 so until I give him a

18  contract that he can -- that he and his attorney believe

19  they can sign, I should go forward with the status quo.

20           THE COURT:  And what do you do in reliance on

21  that statement?

22           MR. MORROW:  At that point, I purchase

23  inventory, I pay contractors to do revisions on the

24  works, I pay to go to eight home school shows.  I begin

25  the development of iPad applications which are very

109

1  popular.  I do all the things that one normally does

2  when one is running a company and selling a product

3  and that involves a pretty significant investment on my

4  part.

5          THE COURT:  Now, Miss Woodrow --

6          MS. WOODROW:  Yes.

7          THE COURT:  -- are we left with the question of

8  going forward with a breach of contract allegation

9  against Mr. Morrow and Wave 3?  If so, I don't think

10 you're entitled to your restraining order.

11         You're entitled to a damage remedy for

12 essentially $550,000 in AVKO's name against Wave 3 or Mr.

13 Morrow and that's a detail that is of significance to him

14 but for another day.  Or are we going to unwind the

15 transaction and elect a rescission and restitution

16 remedy?

17         MS. WOODROW:  If the issue of the damages

18 caused -- well, the problem is, there are damages that

19 have occurred in terms of the rescission by the

20 misrepresentation and the fraud of the claimant.  Not the

21 claimant, excuse me, of Mr. Morrow, and I think we are

22 entitled to some damages for that and I think they would

23 offset -- I think they might offset each other so that

24 frankly --

25         THE COURT:  And let me suggest -- let me

110

1    suggest --

2         MS. WOODROW:  -- if they would return the

3    publishing rights to us, we pay them nothing, they pay us

4    nothing, we all walk away, I think the clients would

5    agree to that.  I could get them to agree.

6         THE COURT:  Let's stop for just a moment.  Let's

7    first of all recognize that we're going to jettison the

8    contract enforcement action.  We're going to elect

9    rescission and restitution so that Mr. Morrow can go his

10   way and AVKO can go its way, right?

11        MS. WOODROW:  That would be -- I would have

12   to -- I would ask for an opportunity to confer with the

13   clients to let them make that decision and explain it to

14   them.

15        THE COURT:  So let's -- let's discuss what is

16   involved in that.  Let's start with Mr. McCabe's

17   position.  Mr. McCabe's position is that between June of

18   2010 and whenever the case got filed --

19        MS. WOODROW:  July of 2011.

20        THE COURT:  -- because Mr. Morrow, in an

21   unauthorized fashion, continued to market these -- these

22   materials, he was deprived of a certain economic loss.

23   He had, over the course of the prior years, since the

24   early '80s, been able to raise someplace between eighty

25   and $291,000 dollars of revenue.  I don't know what his

1  associated costs were.

2        MS. WOODROW:  Correct.  For the past three

3  years, were I think two ninety-one and a little less than

4  that, two sixty or something.

5        THE COURT:  I think you're going to find that

6  two ninety-one was your high.

7        MS. WOODROW:  Absolutely, you betcha.

8        MR. DI GIACOMO:  Your Honor, can I comment on

9  that?

10        THE COURT:  And that's also gross revenue.  It's

11  not net revenue.

12        MS. WOODROW:  That is correct.

13        MR. DI GIACOMO:  Your Honor, can I make one

14  statement on that?  The calculation of two ninety is

15  membership fees as well which is -- has nothing to do

16  with sales, as well as donations to AVKO the foundation.

17  So the two ninety is not an accurate representation of

18  sales in any way.

19        THE COURT:  All right.  As an example, let's

20  just take that one year.  Do you know what the breakdown

21  is?

22        MR. DI GIACOMO:  I don't have it in front of me

23  but I can definitely get it to you.  We've done it in

24  the past.  I believe we brought it to the status

25  conference.

1          MR. MORROW:  Your Honor, if I may speak, the --

2          MS. WOODROW:  Yes, there were some

3  significant -- there were some non-revenue, dealer

4  revenue and non-dealer revenue.

5          THE COURT:  What were your sales revenue in that

6  year with the two ninety-one revenue?

7          MS. WOODROW:  The year ending June 30, 2010, the

8  dealer and non-dealer revenue was approximately one

9  hundred twenty-nine dollars, six hundred eighty-five

10  dollars, thirty-two cents.

11          THE COURT:  I don't think that's right.

12          MS. WOODROW:  Two hundred --

13          MR. McCABE:  Let's add these two together.

14          MS. WOODROW:  I am.  Two hundred twenty-nine

15  dollars, six hundred eighty-five dollars.

16          MR. McCABE:  You mean two hundred twenty-nine

17  thousand?

18          MS. WOODROW:  Yes.

19          MR. McCABE:  YOU said two hundred twenty-nine

20  dollars.

21          MS. WOODROW:  Oh, two hundred twenty-nine

22  thousand, sorry about that.  Trying to add at the same

23  time.

24          THE COURT:  And approximately what number did

25  you arrive at?

1          MS. WOODROW:  I'm sorry?

2          THE COURT:  What was the number that you arrived

3   at?

4          MS. WOODROW:  All right.  Two hundred --

5          THE COURT:  Approximately.

6          MS. WOODROW:  -- twenty-nine.  Two hundred

7   thirty thousand.

8          THE COURT:  Two hundred thirty?

9          MS. WOODROW:  Roughly, rounding it up.

10         THE COURT:  And that was gross revenue?

11         MS. WOODROW:  That would be gross revenue.  We

12   have returns of $1,962.21.

13         THE COURT:  So --

14         MS. WOODROW:  There were donations.

15         THE COURT:  -- Mr. McCabe's argument would be

16   that there was some discernible loss that occurred to

17   AVKO's revenue --

18         MS. WOODROW:  Correct.

19         THE COURT:  -- as a result of Mr. Morrow's

20   involvement in the market.

21         MS. WOODROW:  Yes.

22         THE COURT:  Is your client, if he were to take

23   the stand, going to say, go ahead with the status quo,

24   make your best effort at proceeding to market the works?

25   Is he going to say he didn't say that?

1          MS. WOODROW:  He is not going to say that.

2          THE COURT:  What's he going to say?

3          MS. WOODROW:  I'm not going to let him say that

4    because we have an e-mail where he did say that.  What he

5    meant by that, of course, I can't know, I can just only

6    go with what the words say and --

7          MR. McCABE:  Status quo at that time was the

8    contract of June 4th, the only signed one, which had a

9    lot of stipulations in it, including the -- hiring me to

10   help with the development.  Product development

11   committee, he called it.

12         MR. DI GIACOMO:  Your Honor, that was a

13   permissory provision within the contract, if the contract

14   was enforced.  That wasn't a mandatory provision.  It was

15   that he can use Mr. McCabe --

16         MS. WOODROW:  It was nice.

17         MR. McCABE:  He used it to entice me to sign for

18   AVKO.

19         THE COURT:  Now, we have decided but we are not

20   talking about contract enforcement here.  We are talking

21   about rescission.

22         MS. WOODROW:  Right.

23         THE COURT:  Right?

24         MS. WOODROW:  The e-mail says:

25         "Until you can come up with an agreement

1          that my attorney can justify my signing, we

2          had better just maintain the status quo."

3          THE COURT:  Now, he says -- I understand Mr.

4     McCabe's position here, which is that Mr. Morrow's

5     continuing efforts may have had an impact on diminishing

6     the amount of gross revenue that he would have earned

7     during that period of time, but he told him to go ahead

8     and he told him you're -- you're authorized to make some

9     expenditures in continuing this business.  Is he --

10          MS. WOODROW:  He had --

11          THE COURT:  Is he entitled to return --

12          MS. WOODROW:  I do not believe so.

13          THE COURT:  -- any of that net revenue, not

14     necessarily gross revenue, as a result of his e-mail?

15          MS. WOODROW:  No, he is not.  Because in theory,

16     you could look at it as a licensing.  The $50,000 was

17     certainly a very small sum to pay as rental or use of the

18     right to publish the materials from which he earned a

19     couple hundred thousand dollars.

20          THE COURT:  Gross revenue.

21          MS. WOODROW:  Okay.  He certainly had to have

22     contemplated there would be expenses in publishing prior

23     to his signing the contract on June 4th, 2010.

24          THE COURT:  So what we're really down to, so far

25     as you're concerned is, we're going to rescind the

116

1    transaction.  Your client, AVKO, is ultimately going to

2    receive all of the intellectual property that they might

3    otherwise have received.  A restraining order therefore

4    would be appropriate.

5            You have in place a bond, as I recall, such that

6    if --

7            MS. WOODROW:  Not yet.  We will get it.

8            THE COURT:  Oh.  Okay.  Well, we will talk about

9    that here in a minute.

10           Then the only remaining issue that -- issues

11   that we've got in the context of the case are, how do we

12   resolve the fact on the one hand that after Mr. McCabe

13   said continue the status quo, his sales dropped because

14   of what Mr. Morrow did, continued to participate in the

15   market.  And he would otherwise have earned that -- AVKO

16   would otherwise have earned that amount of money.

17           Offsetting that, is Mr. Morrow saying, he told

18   me status quo, continue to market this and I put

19   additional money in and I need you to look at the fact

20   that in reliance on his statement, I went ahead and did

21   what I did and I would like something back for the fact

22   that I did that in reliance on his statement.

23           We've got to offset those two arguments,

24   right?

25           MS. WOODROW:  No.  He got the income from doing

1  that.  He did not -- at no time did Morrow ever offer to
2  return any and rescind the contract other than he
3  repudiated it by conduct without telling anyone but he
4  never rescinded the contract.  He never said all right,
5  if you won't sign this new agreement, I won't publish, I
6  won't go forward.  I want my money back.  You get your
7  property back, you can continue publishing yourself.  He
8  never did that.
9          THE COURT:  You have, in the context of this
10 case, said I'm electing my remedies.
11         MS. WOODROW:  Okay.
12         THE COURT:  Rescission and restitution.
13         MS. WOODROW:  If we elect -- if we elect that
14 remedy.
15         THE COURT:  So we've agreed that rescission is
16 what is appropriate.  The only question is evaluating
17 what the appropriate restitution is for the two parties.
18         MS. WOODROW:  And there would be restitution for
19 the loss of income from AVKO which would balance out the
20 loss of expenses by Mr. Morrow.
21         THE COURT:  All I'm suggesting to you is that
22 we've got a defined time period, essentially June of 2010
23 through whatever the -- well, say today's date, what
24 AVKO's lost revenue is as a result of Mr. McCabe telling
25 Mr. Morrow, let's continue the status quo.  And that by

118

1    reason of that, anything that Morrow earned, he ought to
2    get back.
3           Right?
4           MS. WOODROW:  Right.  Anything that Morrow
5    earned, he should get back?
6           THE COURT:  Mm-hmm.  What if he didn't earn
7    anything?
8           MS. WOODROW:  What if he decided to buy a jet?
9           THE COURT:  I'm willing to take the bet that he
10   did not buy a jet.
11          MS. WOODROW:  No, but I mean, I don't know
12   that -- I don't think it is -- would be fair and I don't
13   think it's appropriate because he did not use his
14   advertised best efforts.  Had he advertised more, he
15   would have earned more.
16          THE COURT:  You're talking contract -- you're
17   talking contract enforcement.  Now, my -- my point here
18   is that we've got a fairly clearly defined period of
19   time.  We know that with the remedy that you've
20   elected --
21          MS. WOODROW:  If that's -- if that's the remedy
22   that they choose.
23          THE COURT:  They've agreed.  You've said, we
24   don't want contract enforcement.  We don't want our
25   judgment for $550,000.  We want our stuff back.  So --

1          MS. WOODROW:  And I don't know that -- I don't

2     know that that's what the clients would like.

3          THE COURT:  You need to talk with them.

4          MS. WOODROW:  I would like to.

5          THE COURT:  But remember --

6          MS. WOODROW:  Yes.

7          THE COURT:  -- that concomitant with that, would

8     be the responsibility to at least pay back the $50,000

9     and what remains is a fairly simple equation and that is

10    to make a determination of what AVKO may have lost as a

11    result of the fact that Mr. McCabe told Mr. Morrow to go

12    forward with the status quo, knowing that it was going to

13    reduce his revenue on the one hand versus Mr. Morrow's

14    countervailing argument which is, Mr. McCabe owes me

15    something as a result of my own reliance damages because

16    I invested additional capital, time and effort in trying

17    to market this stuff and now he is telling me stop.

18    We've got -- we've got to place values on those -- on

19    those two different theories, right?

20         MS. WOODROW:  Again, yes.

21         THE COURT:  And part of -- part of our decision

22    as to the propriety of those remedies is largely going to

23    turn on the set of events that took place when Mr. Morrow

24    left HSH and HSI, what he told Mr. McCabe, and whether

25    Mr. McCabe agreed.  And that really is kind of in a

120

1    nutshell all that really remains.  Your client tenders

2    the $50,000.  We have an open question on what we do with

3    the $25,000 that I believe --

4            MR. McCABE:  He made money on.

5            THE COURT:  He may have.  I'm not disputing

6    that.  What we're looking at is an accounting time period

7    that's fairly narrow.  And today, we've only talked in

8    gross numbers, not net numbers.  Our net numbers are

9    going to get -- are going to be contracted, they are

10   going to be smaller.  As an example, you may have had

11   $230,000 of gross revenue but you've got some offsetting

12   expenses that were avoided more likely than not in

13   conjunction with the fact that he was producing that

14   revenue.

15           MR. McCABE:  May I speak to that?

16           THE COURT:  Sure.

17           MR. McCABE:  The expenses operating the

18   foundation would remain -- have remained the same.

19           THE COURT:  Mm-hmm.

20           MR. McCABE:  So the -- we did lose the -- all of

21   those sales to the dealership -- to the dealers and

22   that's at least, dropping it down to the gross profit,

23   minimum of $62,000.

24           THE COURT:  Over that time period.

25           MR. McCABE:  That's just over that one year.

121

1           THE COURT:  Is that a gross revenue?

2           MR. McCABE:  That would be over 2010.

3           THE COURT:  Is that gross or net?

4           MR. McCABE:  That's the gross profit.  The

5    expenses --

6           MS. WOODROW:  After expenses.

7           MR. McCABE:  -- remain the same.

8           THE COURT:  That doesn't make sense to me.

9           MS. WOODROW:  What's your net -- what's your net

10   profit?  What did you end up with after everything was

11   paid?  What kind of profit did you have?

12          MR. McCABE:  On the sales?

13          MS. WOODROW:  Yes.

14          MR. McCABE:  It would be about 25 percent of the

15   sales, total.

16          MS. WOODROW:  So about forty thousand?  Forty,

17   fifty thousand?

18          MR. McCABE:  Yeah, and when you consider those

19   years, that's what it -- what it would have been.

20          THE COURT:  Well, do you want --

21          MR. McCABE:  Most of our expenses was in running

22   the foundation which has nothing to do with the

23   publishing aspect of it.

24          THE COURT:  Yes, but those expenses are going to

25   exist in any event, true?

1          MR. McCABE:  That's correct.

2          THE COURT:  Those are -- whether they are fixed

3    or variable, they are nevertheless associated -- expenses

4    that were associated with the independent operation of

5    the foundation.

6          Now, next question in terms of the way we've

7    kind of narrowed this, we've got two things kind of going

8    on.  Does the plaintiff take the position that in

9    measuring the restitution remedy, you're entitled to your

10   lost revenue on the one hand or to whatever he would have

11   or did earn?  It seems to me those are mutually

12   exclusive.

13         MS. WOODROW:  I don't -- I've ordered the

14   restatement of contracts and that hasn't come, that

15   volume.  They didn't send it yet so I haven't necessarily

16   been able to do the research on that.

17         THE COURT:  Mr. Morrow, you're a cost

18   accountant.

19         MR. MORROW:  Yes, sir.

20         THE COURT:  What do you -- if we were going to

21   try to account for placing the parties back in the

22   position that they would have been, had rather -- you've

23   gone -- simply stopped at the stage in which you proposed

24   Wave 3 and the other approaches, how do you think you

25   develop a formula?  I mean, we've talked about gross

123

1   revenue but we really are talking about net revenue and

2   placing both parties back in the position they would have

3   been had that event not taken place.

4          MR. MORROW:  It's a little more complicated than

5   that, your Honor.  You would also need to account for the

6   fact that there are various overheads associated with

7   shipping.  For example, the foundation employs two

8   individuals who do all the shipping.  That cost is

9   directed to the foundation but in reality, it would have

10  been associated with shipping the goods.  You know, if

11  the foundation elects to change their duties from

12  shipping goods to whatever, because they are no longer

13  shipping goods, that cost still would have been there had

14  they still been shipping.

15         I think probably the easiest way to look at this

16  is to look at the actual profitability per se of AVKO

17  itself.  While it's a non-profit, it still has to report

18  a surplus or a deficit.  AVKO has been reporting

19  deficits, as far as I know, for the last several years

20  while they were shipping all that they were shipping.

21  So it doesn't seem very likely that there would be a

22  profit.

23         THE COURT:  Prior to -- prior to June of 2010.

24         MR. MORROW:  Correct, prior to the transition of

25  responsibility.

124

1        THE COURT:  Your point, as a cost accountant, is

2   that each one of those onesie twosie transactions in

3   terms of net revenue was costing AVKO more than they were

4   earning.

5        MR. MORROW:  Correct.

6        THE COURT:  Notwithstanding the fact that Mr.

7   McCabe, who views those transactions as having

8   independent significance for the -- for the children that

9   are learning, as being one of the functions of the

10  foundation and that sticks in his craw when you say it

11  isn't worth it.  He thinks it's worth it.  Your point

12  simply is that the net revenue doesn't justify it.

13       MR. MORROW:  And then there is the additional

14  strategic issue in that those distributors that are

15  providing the bulk of his revenue object strenuously to

16  being sold against by a publisher.  So in the end, those

17  children still get those books but rather than getting

18  them from me, they get them from christian book

19  distributors, Rainbow, Timberdoodle, Heppner's Legacy,

20  children's books, whomever.  Not filling the onesie

21  twosie doesn't prevent that child from getting the book.

22  It just means they get it from someone other than me.

23       THE COURT:  Now, it seems to me that we've got

24  a much more narrow question in front of us going

25  forward.  We've agreed, if I understand accurately, that

125

1   you agree that Wave 3 Learning is to be dismissed from

2   the case.

3           MS. WOODROW:  Wave 3 Learning?

4           THE COURT:  Yes.  You never had a contract with

5   Wave 3.

6           MS. WOODROW:  Correct.

7           THE COURT:  You agree that Mr. McCabe has no

8   particular interest personally in the case.  AVKO is the

9   only party that has a party in interest as a result of

10  having enforceable legal rights.

11          MS. WOODROW:  Yes, your Honor, as to the

12  contract issues.  However, as to the copyright issues, I

13  think that the author always has an interest in it, even

14  though he may have assigned those.  He, you know --

15          THE COURT:  I would strongly suggest that you

16  look carefully at the law on that question.

17          MS. WOODROW:  Okay.  He probably doesn't really

18  have any interest other than emotional.

19          THE COURT:  Well, respectfully, the gentleman

20  has invested a large portion of his life in this product.

21          MS. WOODROW:  Yes, but he did assign all the --

22  he did assign all the copyrights over to the AVKO so

23  essentially, AVKO is the only interested party.

24          THE COURT:  And my point is simply to suggest

25  that I think it is fair to expect that while he may not

126

1   have a property interest that would be retained by that

2   personal property interest, it in part at least at a

3   certain level reflects his life's work.

4          MS. WOODROW:  Yes.

5          THE COURT:  And so the fact that he may have a

6   strong opinion here is not unexpected.

7          MS. WOODROW:  Yes.

8          THE COURT:  But we are, I think, able to narrow

9   a couple of additional things down.  We've eliminated a

10  contract cause of action.  We've decided that that is an

11  alternative that you are electing against and that we're

12  looking at rescission, your choice.

13         MS. WOODROW:  Not necessarily.  I need to talk

14  with my clients before I narrow one or the other but I

15  think we have -- even if we go to rescission, I think we

16  have to understand that we were placed in this position.

17  AVKO was placed in this position by the bad faith and the

18  fraud and misrepresentation and the bad conduct of Mr.

19  Morrow.  Had he not breached his contract, there would

20  not -- this would not have happened.  Had he not

21  repudiated the contract, there would not have been a need

22  for any reliance issues.  We didn't know he repudiated

23  the contract and his --

24         THE COURT:  You can come back and we can take

25  testimony from both of these gentlemen, particularly

1  concerning the representations that take place between

2  June of 2010, at a point in time --

3          MS. WOODROW:  You mean after the contract was

4  signed.

5          THE COURT:  Yep, and when HSI and HSH are

6  folding and Mr. Morrow is leaving.  We can take testimony

7  concerning that.  Now, I know, generally, what the two

8  clients are going to say, at least in part.

9          MS. WOODROW:  Correct.

10          THE COURT:  I know what Mr. Morrow is going to

11  say is, I explained the problems that we had with HSH to

12  the extent of my ability at the time.  Indeed, I

13  explained why the subscription agreement was necessary

14  for the completion of the refinancing an IPO.

15          Later on, shortly thereafter, when the

16  transaction began to unwind with HSI and HSH and I left

17  and I was trying to convince him to go forward with this

18  transaction, I offered him a promissory note.  That was

19  unacceptable but nevertheless, he did tell me -- he did

20  tell me, let's just try to maintain the status quo.

21          So it's those set of events as they relate to

22  an accounting for the two parties' respective financial

23  circumstances that follow immediately after that, that

24  are kind of the offsetting claims that we need to

25  determine with respect to restitution.

128

1          And having elected that remedy, I would suggest
2    to you that you are, I believe, entitled to the
3    restraining order.
4          MS. WOODROW:  With the rescission.
5          THE COURT:  Provided that the bond is in place
6    so that in net, you owe them more money than they owe
7    you.  That's the purpose of a bond with a restraining
8    order.
9          MS. WOODROW:  Thank you, your Honor.
10         THE COURT:  Now, what I will do is try to locate
11   some additional -- if I can find like a two-hour block of
12   time because I have to start -- I have to start switching
13   gears for the calendar for --
14         MS. WOODROW:  The next hearing, yes, your Honor.
15         THE COURT:  -- the hearing this afternoon,
16   hopefully in the next four or five weeks.  And then I
17   will look to you for some guidance as to whether or not
18   you need that time.
19         Now, here -- here is the question that I've got
20   because I would anticipate you're going to need a bond at
21   least in the amount of $75,000.
22         MS. WOODROW:  Okay.
23         THE COURT:  It's been a while since I've been in
24   practice.  There were two ways in which I was always able
25   to do that with my client.  If I had $75,000 worth of

129

1   cash of AVKO at a bank, I was often able to get a bank to

2   segregate the seven hundred and fifty thousand dollars

3   and issue a bond commitment that with those segregated

4   funds, that they would remain segregated and available

5   for -- for payment.

6           MS. WOODROW:  Are you saying the bond amount

7   should be seventy-five thousand or seven hundred fifty?

8           THE COURT:  Seventy-five.

9           MS. WOODROW:  Thousand.

10          THE COURT:  For the benefit of Wave 3/Morrow.

11  Because I know that there was $25,000 -- excuse me,

12  $75,000 that have changed hands.

13          MS. WOODROW:  Okay.

14          THE COURT:  The alternative is to go to an

15  insurance company and they will do the same thing which

16  is to essentially say, we need collateral in the amount

17  of a hundred -- a hundred to a hundred twenty-five

18  thousand and we will write you a bond and that will

19  cost -- the premium that we are going to charge you is

20  $5,000 for doing that.

21          MS. WOODROW:  All right.

22          THE COURT:  But given the fact that we know that

23  money changed hands and the requirements for the

24  restraining order, that bond, I think, is appropriate

25  under the circumstances.

130

1          There may be some offsetting entries.  I
2     appreciate that.  That's what we'll have to work out in
3     the courtroom as a result of our focus on the
4     representations that got made when HSI folded and Mr.
5     Morrow elected to attempt to continue the transaction,
6     what he explained to Mr. McCabe, and then we will sort
7     out the expenses that are associated with disassociating
8     these folks going forward.  And that will be the focus of
9     our -- our next hearing.
10          I believe under those sets of circumstances,
11    that the issue of whether we are dealing with
12    distribution rights versus an ownership interest in the
13    copyrights is irrelevant.  That goes away.
14          I appreciate your time this morning.
15          MS. WOODROW:  Thank you very much, your Honor.
16          MR. DI GIACOMO:  Your Honor, before you
17    complete, we do still have three outstanding motions.
18    I'm assuming that the Motion to Strike is done away with
19    by today's proceeding.  We have a Motion for Default
20    that's still on the table.  And we also have a Motion to
21    Amend the Plaintiff's Complaint.
22          How should we dispose of them?  Those were --
23    those were noticed for today's hearing.
24          MS. WOODROW:  Can we continue those?
25          THE COURT:  You really don't have opposition to

1  their Motion to Amend.

2          MR. DI GIACOMO:  I have opposition in the sense

3  that they've added a claim and delivery claim that is

4  simply not justified by the facts, your Honor.  Claim and

5  delivery does not apply to intangible property.

6          THE COURT:  Right.

7          MR. DI GIACOMO:  Both under the federal rules

8  and under state law.

9          MS. WOODROW:  Well, we want the actual disks

10  back, some of the materials back.  That would be -- if

11  there is a rescission, then we would -- we would be

12  entitled to have that back.

13          MR. DI GIACOMO:  Presuming that the plaintiff

14  wants to --

15          MS. WOODROW:  That would be a declaratory

16  judgment count.

17          THE COURT:  I think her thinking is to limit the

18  claim and delivery action to tangible property.

19          MS. WOODROW:  Disks are tangible.

20          THE COURT:  But that you sold.

21          MS. WOODROW:  Not the disks.  Not the disks that

22  they gave them, where they gave them the materials.

23          THE COURT:  But they have never been paid for

24  that.

25          MR. DI GIACOMO:  Your Honor, the Copyright Act

1   says that any rights coextensive with Section 106 are

2   preempted by federal copyright law, including the

3   embodiment of works on this.  That's the reason that we

4   filed our opposition to the Plaintiff's Motion to Amend

5   the Complaint.

6          THE COURT:  And that's not simply to say that

7   they lose any entitlement --

8          MR. DI GIACOMO:  No, not at all.

9          THE COURT:  -- to the extent they are legally

10  right.  It's just the wrong remedy.

11         MR. DI GIACOMO:  We just want to make sure that

12  the extent of this proceeding is limited as much as

13  possible.

14         MS. WOODROW:  So you're objecting to replevin.

15         MR. DI GIACOMO:  Yes.  And I'm assuming that the

16  plaintiff would want to amend in light of discussions

17  with the client relating to the election of rescission

18  versus contract.  I just want to make that clear for the

19  record.

20         THE COURT:  And let me indicate while we have

21  not issued a written opinion, I recall the events related

22  to the default -- request for default judgment.  If

23  necessary, I will be denying that request.

24         MR. DI GIACOMO:  Thank you, your Honor.

25         MS. WOODROW:  Thank you, your Honor.

133

1          THE COURT:  The record is closed.  Thank you for

2   your time this morning.

3          MS. WOODROW:  Thank you.  I appreciate your

4   efforts.

5          THE LAW CLERK:  All rise.  Court is now

6   adjourned.

7              (At 12:27 p.m. - proceedings adjourned)

8                          *****

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

134

1                    *CERTIFICATE OF COURT REPORTER*

2

3

4              I, PEG L. GOODRICH, Official Court

5    Reporter in and for the United States District

6    Court, Eastern District of Michigan, appointed

7    pursuant to the provisions of Title 28, United

8    States Code, Section 753, do hereby certify that

9    the foregoing proceedings held before the HONORABLE

10   THOMAS L. LUDINGTON, District Court Judge, is a true

11   and correct transcript of my stenotype notes in the

12   matter of AVKO EDUCATIONAL RESEARCH FOUNDATION,

13   et al., v THOMAS A. MORROW, et al., File No.

14   11-13381, held on Monday, January 23, 2012.

15

16

17

18

19
                            s/Peg L. Goodrich
20                          Peg L. Goodrich, CSR, RPR, RMR
                            Federal Official Court Reporter
21                          United States District Court
                            Eastern District of Michigan
22

23
     Date:  January 30, 2012
24          Bay City, Michigan

25